## WOOD *v.* GEORGIA.

No. 369.   Argued March 29, 1962.—Decided June 25, 1962.

*Milton Kramer* argued the cause for petitioner.   With him on the briefs was *James I. Wood.*

*'E. Freeman Leverett,* Deputy Assistant Attorney General of Georgia, argued the cause for respondent.   With

him on the briefs were *Eugene Cook*, Attorney General, *William M. West*, Solicitor General, and *Jack J. Gautier*, Assistant Solicitor General.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

We granted certiorari to consider the scope of the constitutional protection to be enjoyed by persons when the publication of their thoughts and opinions is alleged to be in conflict with the fair administration of justice in state courts. The petitioner, an elected sheriff in Bibb County, Georgia, contends that the Georgia courts, in holding him in contempt of court for expressing his personal ideas on a matter that was presently before the grand jury for its consideration, have abridged his liberty of free speech as protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.

On June 6, 1960, a judge of the Bibb Superior Court issued a charge to a regularly impaneled grand jury, giving it special instructions to conduct an investigation into a political situation which had allegedly arisen in the county. The jury was advised that there appeared to be "an inane and inexplicable pattern of Negro bloc voting" in Bibb County, and that "rumors and accusations" had been made which indicated candidates for public office had paid large sums of money in an effort to gain favor and to obtain the Negro vote. The charge explained that certain Negro leaders, after having met and endorsed a candidate, had switched their support to an opposing candidate who put up a large sum of money, and that this "create[d] an unhealthy, dangerous, and unlawful situation [which] tend[ed] to corrupt public office holders and some candidates for public office." The charge continued by indicating the violations of law which would be involved should the grand jury find the charges

to be founded in truth.[1]   In addition, certain questions were posed to the jury which it was to investigate in inquiring into the charges of election law violations.[2]

[1] The Georgia Legislature has provided that it shall be a misdemeanor for any person to "[b]uy or sell, or offer to buy or sell, a vote, or [to] . . . be in any way concerned in buying or selling, or contribute money or any other thing of value for the purpose of buying a vote at any election . . . ."   Ga. Code Ann., § 34–9907.   See also Ga. Code Ann., § 34–1907, included in the court's charge.

[2] More fully, the charge, in relevant part, contained the following:

"GENTLEMEN OF THE GRAND JURY:

"The special instructions now about to be given to you were determined upon and formulated by all of the Judges of this Court en banc after joint consultations and are fully sanctioned by all the Judges.

.          .          .          .          .

"A situation has arisen in Bibb County over the last few years which this Court feels should be thoroughly and completely investigated by the Grand Jury. . . .

"In election after election where no racial issues are involved, and where there are no other issues involved which could possibly cause any particular group to be honestly concerned about supporting or opposing any particular candidate, we find what appears an inane and inexpicable pattern of Negro bloc voting.

"Now there is an answer to the existing situation which should be brought to light so that people of this community may understand what is going on in some of our elections, and do something about it. The people are entitled to know how one candidate or another is able to gather to himself thousands of Negro votes in bloc where there is no apparent reason for it.

.          .          .          .          .

"This Grand Jury is hereby instructed by the Court to investigate and examine into the facts of every election of every kind in this County for the past several years in which bloc voting is apparent. Although there are many intelligent and independent voters among the colored people who deplore this situation, it is nevertheless obvious that about 80% to 85% of the Negro voters engage in bloc voting. . . .

.          .          .          .          .

". . . [T]he matter you are directed to investigate is the persistent rumors and accusations concerning the methods used in the solicita-

378

The instructions were given in the midst of a local political campaign and the judge, in order to publicize the investigation, requested reporters for all local news media

tion of the Negro vote and the alleged bartering of the bloc vote. There are accusations that candidates for public office have paid large sums of money to certain leaders of the Negro in an effort to gain their favor and get the Negro vote. There are accusations that candidates and their supporters have paid, and these leaders of the Negroes have accepted, money for the purpose of influencing the Negro people to bloc vote for certain candidates. . . .

"These rumors being circulated, and about which you have been charged, are either true or false and it is the duty of this Grand Jury to determine wherein the truth lies.

"Some questions which this Jury should have answered in your investigation of elections are: Was the Negro vote delivered in bloc to any candidate or candidates? If so, who delivered it and how was it done? What contact did the candidates or their supporters have with the Negro group or its leaders? What money was involved, if any? How was the money used? What workers were employed? What promises did the candidate make, if any, in order to obtain the bloc vote?

"Now, gentlemen, it is your duty to develop the facts of this situation and if there is sufficient evidence of unlawful acts, then all parties participating, white and colored, candidates or non-candidates, should be indicted by this Grand Jury so that the guilty parties, if there are any, may be brought to trial.

"Furthermore, it is your duty to bring to light those practices which, while not technically in violation of any law, are yet so immoral or corrupt as to be destructive of the purposes of our system of elections. It is further your right and duty to determine what additional laws, or amendments to existing laws, are needed to adequately deal with the situation with which we are faced and to recommend enactment thereof by the Legislature.

"The enormity of the task assigned you by these instructions is recognized, but surely all good citizens, both public and private, who stand for good government and an honest elective system will be willing to come before this Grand Jury and disclose every fact concerning the matters about which you are being instructed."

to be present in the courtroom when the charge was delivered.

The following day, while the grand jury was in session investigating the matters set forth in the instructions delivered by the court, the petitioner issued to the local press a written statement in which he criticized the judges' action and in which he urged the citizenry to take notice when their highest judicial officers threatened political intimidation and persecution of voters in the county under the guise of law enforcement. This news release, which was published and disseminated to the general public, stated:

"Whatever the Judges' intention, the action . . . ordering [the grand jury] . . . to investigate 'negro block voting' will be considered one of the most deplorable examples of race agitation to come out of Middle Georgia in recent years.

"At a time when all thinking people want to preserve the good will and cooperation between the races in Bibb County, this action appears either as a crude attempt at judicial intimidation of negro voters and leaders, or, at best, as agitation for a 'negro vote' issue in local politics.

"No one would question the duty of a Grand Jury to investigate any and all election law violations. However, simple justice would demand that the Judge not single out the negro people for particular investigation. . . .

.        .        .        .        .

"Negro people will find little difference in principle between attempted intimidation of their people by judicial summons and inquiry and attempted intimidation by physical demonstration such as used by the K. K. K.

380

"It is hoped that the present Grand Jury will not let its high office be a party to any political attempt to intimidate the negro people in this community.

"It seems incredible that all three of our Superior Court Judges, who themselves hold high political office, are so politically nieve [naive] as to actually believe that the negro voters in Bibb County sell their votes in any fashion, either to candidates for office or to some negro leaders.

"If anyone in the community [should] be free of racial prejudice, it should be our Judges. It is shocking to find a Judge charging a Grand Jury in the style and language of a race baiting candidate for political office.

.    .    .    .    .

"However politically popular the judges action may be at this time, they are employing a practice far more dangerous to free elections than anything they want investigated.    "James I. Wood."

The following day, the petitioner delivered to the bailiff of the court, stationed at the entrance to the grand jury room, "An Open Letter to the Bibb County Grand Jury," which was made available to the grand jury at petitioner's request. This letter, implying that the court's charge was false, asserted that in the petitioner's opinion, the Bibb County Democratic Executive Committee was the organization responsible for corruption in the purchasing of votes, and that the grand jury would be well-advised also to investigate that organization.

A month later, on July 7, 1960, the petitioner was cited in two counts of contempt based on the above statements. The citation charged that the language used by the petitioner was designed and calculated to be contemptuous of the court, to ridicule the investigation ordered by the charge, and "to hamper, hinder, interfere with and

obstruct" the grand jury in its investigation. It also alleged that the news release was issued from the Bibb County Sheriff's Office, located in the courthouse in which the grand jury had been charged and where it was deliberating, and that the language imputed lack of judicial integrity to the three judges of the court responsible for the charge. An amendment to the citation alleged that the statements "in and of [themselves] created . . . a clear, present and imminent danger to the investigation being conducted . . . and . . . to the proper administration of justice in Bibb Superior Court."

The next day the petitioner issued a further press release in which he repeated substantially the charges he had made in the release on June 7, and in which he asserted that his defense to the contempt citation would be that he had spoken the truth. The contempt citation was thereupon amended by including a third count based on this latter statement. The third count contained the same allegations as the other counts and, in addition, charged that the petitioner's action presented a clear and present danger to the handling of the contempt citation against the petitioner.

At a hearing before the trial judge,[3] certain facts were stipulated: that the petitioner's statements were made while the grand jury was in session investigating matters suggested in the charge by the court; that the grand jury had before it the voting tabulations and other documents, including endorsements by certain political groups relating to primaries and elections in which the petitioner participated as a candidate and as an active supporter for other candidates; and that the members of the grand jury and the judges themselves had seen and read the

---

[3] The charge that was delivered to the grand jury was prepared by the three judges of the Bibb County Superior Court, and was delivered by one of them. Another one of the three presided at petitioner's contempt hearing.

press releases issued by the petitioner. In addition, it was stipulated that the petitioner's sworn response be admitted as evidence. The allegations in this response, which must be considered as true in the absence of contrary evidence and in the absence of findings of fact by the trial judge, included the verification that the statements were made by petitioner in his capacity as a private citizen and not as sheriff of the county; that petitioner was directly and personally interested in the outcome of the current primary election not only as a private citizen but also as an announced candidate for public office in the general election to be held the following November, and in which election the petitioner would be running against the contestant who prevailed in the democratic primary; that he believed the language employed in the charge was of such a nature that it tended to create or emphasize issues likely to have a drastic impact upon the outcome of the primary; that his purpose in issuing the statements was simply to inform the public of what he sincerely believed to be the other side of the issue created by the charge; and that the statements were not intended to be contemptuous of the court or to hinder the investigation. The petitioner also asserted that he adopted the same method of distributing his views to the general public as did the court in disseminating the grand jury charge. No witnesses were presented at the hearing and no evidence was introduced to show that the publications resulted in any actual interference or obstruction of the court or the work of the grand jury. The gravamen of the contempt citation, and of the State's case against the petitioner, was that the mere publishing of the news release and defense statement constituted a contempt of court, and in and of itself was a clear and present danger to the administration of justice.

The trial court, without making any findings and without giving any reasons, adjudged petitioner guilty on all

counts and imposed concurrent sentences of 20 days and separate fines of $200 on each. On writ of error to the Court of Appeals the convictions on counts one and three were affirmed and the conviction on count two, based on the open letter to the grand jury, was reversed. *Wood* v. *Georgia,* 103 Ga. App. 305, 119 S. E. 2d 261. After the Georgia Supreme Court, without opinion, declined to review the convictions on the first and third counts, the petitioner sought a writ of certiorari to this Court which we granted. 368 U. S. 894.

We start with the premise that the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government and that courts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions. While courts have continuously had the authority and power to maintain order in their courtrooms and to assure litigants a fair trial, the exercise of that bare contempt power is not what is questioned in this case. Here it is asserted that the exercise of the contempt power, to commit a person to jail for an utterance out of the presence of the court, has abridged the accused's liberty of free expression. In this situation the burden upon this Court is to define the limitations upon the contempt power according to the terms of the Federal Constitution.

In *Bridges* v. *California,* 314 U. S. 252, this Court for the first time had occasion to review a State's exercise of the contempt power utilized to punish the publisher of an out-of-court statement. The accused contended that the exercise abridged his right of free speech guaranteed against state infringement by the Fourteenth Amendment.[4] To determine the scope of this constitutional

---

[4] *Thornhill* v. *Alabama,* 310 U. S. 88, 95; *Schneider* v. *State,* 308 U. S. 147, 160; *De Jonge* v. *Oregon,* 299 U. S. 353; *Near* v. *Minnesota,* 283 U. S. 697, 707; *Gitlow* v. *New York,* 268 U. S. 652, 666.

protection, the Court reviewed the history of the contempt power, both in England and in this country. It held that "the only conclusion supported by [that] history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society." *Id.,* at 265.[5] Thus clarifying the exercise of this judicial power in the context of the protections assured by the First Amendment, the Court held that out-of-court publications were to be governed by the clear and present danger standard, described as "a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." *Id.,* at 263.[6] Subsequently, in *Pennekamp* v. *Florida,* 328 U. S. 331, after noting that "[f]ree discussion of the problems of society is a cardinal principle of Americanism—a principle which all are zealous to preserve" (*id.,* at 346), the Court reaffirmed its belief that the "essential right of the courts to be free of intimidation and coercion . . . [is] consonant with a recognition that freedom of the press must

[5] Specifically, the Court, after a thorough review of the history behind both the exercise of the contempt power and the adoption of the First Amendment, rejected the idea that the interests were to be accommodated by applying the common law of England at the time the Constitution was adopted. *Bridges* v. *California,* 314 U. S. 252, 263–268. For source materials on this subject, see Chafee, Free Speech in the United States (1941), c. 1; Fox, The History of Contempt of Court (1927), *passim;* Stansbury, Trial of James H. Peck (1833), *passim;* Thayer, Legal Control of the Press (3d ed. 1956), 483 *et seq.* See also Deutsch, Liberty of Expression and Contempt of Court, 27 Minn. L. Rev. 296 (1943); Nelles and King, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 525 (1928).

[6] The Court went on to say that the clear and present danger standard does not "purport to mark the furthermost constitutional boundaries of protected expression . . . [and that it does] no more than recognize a minimum compulsion of the Bill of Rights." *Bridges* v. *California, supra,* at 263.

be allowed in the broadest scope compatible with the supremacy of order." *Id.*, at 334.[7]   The Court's last occasion to consider the application of the clear and present danger principle to a case of the type under review was in *Craig* v. *Harney,* 331 U. S. 367.   There the Court held that to warrant a sanction "[t]he fires which [the expression] kindles must constitute an imminent, not merely a likely, threat to the administration of justice.   The danger must not be remote or even probable; it must immediately imperil." *Id.*, at 376.[8]

It is with these principles in mind that we consider the case before us.   Initially, however, it should be noted that the Georgia courts have determined that the power to punish for contempt of court is inherent in its state judiciary [9] and the Court of Appeals thus ignored the express limitations imposed by the Georgia Legislature in punishing out-of-court statements.[10]   This holding thus

[7] In *Pennekamp* the Court concluded that "the danger under . . . [the] record to fair judicial administration has not the clearness and immediacy necessary to close the door of permissible public comment. When that door is closed, it closes all doors behind it." 328 U. S., at 350.

[8] In none of these cases, as is also true of the one presently under review, did the Court find it necessary to determine the full power of the State to protect the administration of justice by use of the contempt power. See *Craig* v. *Harney,* 331 U. S., at 373.

[9] *Atlanta Newspapers, Inc.,* v. *State,* 216 Ga. 399, 116 S. E. 2d 580; *McGill* v. *State,* 209 Ga. 500, 74 S. E. 2d 78; *Bradley* v. *State,* 111 Ga. 168, 36 S. E. 630.   But see *Townsend* v. *State,* 54 Ga. App. 627, 188 S. E. 560.

[10] The state legislature has enacted a statute designed to limit the courts in that State in the exercise of the contempt power.   Ga. Code Ann., § 24–105, provides:

"Powers of courts to punish for contempt.—The powers of the several courts to issue attachments and inflict summary punishment for contempt of court shall extend only to cases of misbehavior of any person or persons in the presence of said courts or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the dis-

deprives the judgment of coming to this Court "encased in the armor wrought by prior legislative deliberation," *Bridges* v. *California, supra,* at 261, and it is upon this basis that we proceed.

This case differs from *Bridges* and *Pennekamp,* first, in that the court below has upheld petitioner's conviction on the basis that his conduct presented a clear and present danger to the proceedings of the court and grand jury, a standard this Court has held to warrant punishment for alleged contemptuous conduct. But state courts may not preclude us from our responsibility to examine "the evidence to see whether it furnishes a rational basis for the characterization put on it" (*In re Sawyer,* 360 U. S. 622, 628) by the enunciation of a constitutionally acceptable standard in describing the effect of the conduct. The ultimate responsibility to define the limits of state power regarding freedom of speech and expression rests with this Court, *Pennekamp* v. *Florida, supra,* at 335; see *Chambers* v. *Florida,* 309 U. S. 227, 228–229; *Fiske* v. *Kansas,* 274 U. S. 380, 385–386; and when it is claimed that such liberties have been abridged, we cannot allow a presumption of validity of the exercise of state power to interfere with our close examination of the substantive claim presented.[11]

Despite its conclusion that the petitioner's conduct created a serious evil to the fair administration of justice,

---

obedience or resistance by any officer of said courts, party, juror, witness, or other person or persons to any lawful writ, process, order, rule, decree, or command of the said courts . . . ."

Compare the legislative determination made by the State of California discussed briefly in *Bridges* v. *California, supra,* at 260–261, n. 3.

[11] When the claim is that such a right has been abridged by a state court, "it is incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured." *Norris* v. *Alabama,* 294 U. S. 587, 590. See *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 659; *Truax* v. *Corrigan,* 257 U. S. 312, 325.

the Court of Appeals did not cite or discuss the *Bridges,*
*Pennekamp* or *Harney* cases, nor did it display an aware-
ness of the standards enunciated in those cases to sup-
port a finding of clear and present danger.[12]   It simply
adopted as conclusions of law the allegations made in
the contempt citation.   The court did not indicate
in any manner *how* the publications interfered with the
grand jury's investigation, or with the administration
of justice.   Unlike those cases in which elaborate find-
ings have been made to support such a conclusion,[13]
this record is barren of such findings.   The prosecution
called no witnesses to show that the functioning of the
jury was in any way disturbed; no showing was made
that the members of the grand jury, upon reading the
petitioner's comments in the newspapers, felt unable or
unwilling to complete their assigned task because peti-
tioner "interfered" with its completion.[14]   There is noth-
ing in the record to indicate that the investigation was
not ultimately successful or, if it was not, that the peti-
tioner's conduct was responsible for its failure.   And to
the extent that the conviction on the third count was
upheld because petitioner's last statement presented a
clear and present danger to the contempt hearing, it is
indeed novel that under the circumstances of this case
the petitioner might be responsible for a substantial inter-

---

[12] Compare the findings of the Court of Criminal Appeals of Texas
in *Ex parte Craig,* 150 Tex. Cr. 598, 193 S. W. 2d 178.   See this
Court's discussion of these findings and of the conclusion drawn by
the Texas court on the basis of those findings, *Craig* v. *Harney,* 331
U. S. 367, 370–371, 385–389.

[13] See, *e. g., Toledo Newspaper Co.* v. *United States,* 247 U. S. 402,
414–416.

[14] Georgia law presumably permits grand jurors to so testify:
"Grand jurors shall disclose everything which occurs in their service
whenever it becomes necessary in any court of record in this State."
Ga. Code Ann., § 59–302.

ference with his contempt hearing because he had made public his defense to the charges made against him. What interference to petitioner's hearing or what harm this assertion might inflict on the administration of justice is not stated in the opinion. Nor is there any evidence of either in the record.[15]

Thus we have simply been told, as a matter of law without factual support, that if a State is unable to punish persons for expressing their views on matters of great public importance when those matters are being considered in an investigation by the grand jury, a clear and present danger to the administration of justice will be created. We find no such danger in the record before us. The type of "danger" evidenced by the record is precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification. "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political . . . truth." *Thornhill v. Alabama*, 310 U. S. 88, 95. In *Thornhill* the Court also reiterated the thinking of the Founders when it said that a broad conception of the First Amendment is necessary

> "to supply the public need for information and education with respect to the significant issues of the times. [Footnote omitted.] . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Id.*, at 102.[16]

---

[15] Compare *Toledo Newspaper Co.* v. *United States, supra*, note 13, at 425 (Holmes, J., dissenting).

[16] See also *Lovell* v. *City of Griffin*, 303 U. S. 444; *Stromberg* v. *California*, 283 U. S. 359. See generally 2 Bancroft, History of the United States (1885), 261.

Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment of the rights of free speech and assembly. Cf. Mr. Justice Brandeis, concurring in *Whitney* v. *California,* 274 U. S. 357, 378. Hence, in the absence of some other showing of a substantive evil actually designed to impede the course of justice in justification of the exercise of the contempt power to silence the petitioner, his utterances are entitled to be protected.

The respondent attempts to distinguish this case from *Bridges* by offering, as support for the Georgia court's conclusion thát the petitioner's conduct presented a clear and present danger to the administration of justice, the fact that here there was an alleged interference with a grand jury and not an attempt to influence or coerce a judge. In the circumstances of this case, we find this argument unpersuasive.

First, it is important to emphasize that this case does not represent a situation where an individual is on trial; there was no "judicial proceeding pending" in the sense that prejudice might result to one litigant or the other by ill-considered misconduct aimed at influencing the outcome of a trial or a grand jury proceeding. Compare *Smith* v. *Texas,* 311 U. S. 128; *Chambers* v. *Florida,* 309 U. S. 227; *Pierre* v. *Louisiana,* 306 U. S. 354; *Tumey* v. *Ohio,* 273 U. S. 510; and *Moore* v. *Dempsey,* 261 U. S. 86. Moreover, we need not pause here to consider the variant factors that would be present in a case involving a petit jury. Neither *Bridges, Pennekamp* nor *Harney* involved a trial by jury. In *Bridges* it was noted that "trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper" (314

U. S., at 271), and of course the limitations on free speech assume a different proportion when expression is directed toward a trial as compared to a grand jury investigation. Rather, the grand jury here was conducting a general investigation into a matter touching each member of the community.

Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.[17]  Particularly in matters of local political corruption and investigations is it important that freedom of communication be kept open and that the real issues not become obscured to the grand jury.  It cannot effectively operate in a vacuum.  It has been said that the "ancestors of our 'grand jurors' are from the first neither exactly accusers, nor exactly witnesses; they are to give voice to common repute." 2 Pollock and Maitland, History of the English Law (2d ed. 1909), 642.  The necessity to society of an independent and informed grand jury becomes readily apparent in the context of the present case.  For here a panel of judges, themselves elected officers and charged under state law with the responsibility of instructing a grand jury to investigate political corruption, have exercised the contempt power to hold in contempt another elected representative of the people for publishing views honestly held and contrary to those contained in the charge.  And, an

---

[17] Orfield, Criminal Procedure from Arrest to Appeal (1947), 144–146. See *Hale* v. *Henkel*, 201 U. S. 43, 59–66. See generally Note, The Grand Jury as an Investigatory Body, 74 Harv. L. Rev. 590 (1961).

effort by the petitioner to prove the truth of his allega-
tions was rejected, the court holding irrelevant the truth
or falsity of the facts and opinions expressed in the pub-
lications. 103 Ga. App. 305, 321, 119 S. E. 2d 261, 273.
If the petitioner could be silenced in this manner, the
problem to the people in the State of Georgia and indeed
in all the States becomes evident.

The administration of the law is not the problem of
the judge or prosecuting attorney alone, but necessitates
the active cooperation of an enlightened public. Nothing
is to be gained by an attitude on the part of the citizenry
of civic irresponsibility and apathy in voicing their senti-
ments on community problems. The petitioner's attack
on the charge to the grand jury would have been likely to
have an impeding influence on the outcome of the investi-
gation only if the charge was so manifestly unjust that
it could not stand inspection.[18] In this sense discussion
serves as a corrective force to political, economic and other
influences which are inevitably present in matters of grave
importance. The charge given to the jury indicated that
the motivation for it was founded on rumor, but that the
situation had existed for several years. Yet the charge
was directed primarily against one group in the com-
munity and was given at the height of the highly impor-
tant Democratic primary, in which, because of their elected
positions, both the judges and the petitioner were inter-
ested personally and apart from their official status. The
First Amendment envisions that persons be given the
opportunity to inform the community of both sides of

---

[18] Compare Mr. Justice Holmes, dissenting in *Gitlow* v. *New York*,
268 U. S. 652, 673. See also *Thornhill* v. *Alabama*, 310 U. S. 88;
*Whitney* v. *California*, 274 U. S. 357; *Pennekamp* v. *Florida*, 328
U. S. 331, 370 (concurring opinion) ("To talk of a clear and present
danger arising out of [every] . . . criticism is idle unless the criticism
makes it impossible in a very real sense for a court to carry on the
administration of justice").

the issue under such circumstances. That this privilege should not lightly be curtailed is ably expressed in a passage from Judge Cooley's 2 Constitutional Limitations (8th ed. 1927) 885, where he stated that the purpose of the First Amendment includes the need:

". . . to protect parties in the free publication of matters of public concern, to secure their right to a free discussion of public events and public measures, and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them."

Moreover, it is difficult to imagine how the voting problem may be alleviated by an abridgment of talk and comment regarding its solution. This problem is important not only to an individual or some isolated group or to individual litigants in a particular lawsuit, but affects the entire Nation. When the grand jury is performing its investigatory function into a general 'problem area, without specific regard to indicting a particular individual, society's interest is best served by a thorough and extensive investigation, and a greater degree of disinterestedness and impartiality is assured by allowing free expression of contrary opinion. Consistent suppression of discussion likely to affect pending investigations would mean that some continuing public grievances could never be discussed at all, or at least not at the moment when public discussion is most needed. The conviction here produces its "restrictive results at the precise time when public interest in the matters discussed would naturally be at its height," and "[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression."

*Bridges* v. *California, supra,* at 268, 269. Thus, in the absence of any showing of an actual interference with the undertakings of the grand jury, this record lacks persuasion in illustrating the serious degree of harm to the administration of law necessary to justify exercise of the contempt power. Compare *Craig* v. *Harney,* 331 U. S. 367, 376, 378; *Pennekamp* v. *Florida,* 328 U. S. 331, 349–350.

Finally, we are told by the respondent that, because the petitioner is sheriff of Bibb County and thereby owes a special duty and responsibility to the court and its judges, his right to freedom of expression must be more severely curtailed than that of an average citizen. Under the circumstances of this case, this argument must be rejected.

First, although we do not rely on the point exclusively, we noted at the outset of this opinion that there was no finding by the trial court that the petitioner issued the statements in his capacity as sheriff; in fact, the only evidence in the record on this point is the petitioner's allegation in his response, accepted as evidence by the trial court and uncontroverted by the respondent, that the statements were distributed by petitioner as a private citizen. Nowhere in the record, including the contempt citation as twice amended, can we find one word indicating that the prosecution relied on the fact that petitioner was sheriff to show a more substantial likelihood that his conduct would disrupt the administration of justice.[19] The opin-

---

[19] The amended citation, in relevant part, alleged:

"The Respondent, James I. Wood, Sheriff of Bibb County, is a full-time employee of the County of Bibb and is paid a salary for his services as such officer. Respondent is an officer of the Bibb Superior Court."

There is no allegation that *because* he was sheriff his conduct was more likely to cause a substantive evil than would the same conduct by a private citizen.

ion of the Court of Appeals does not articulate any specific reliance on this fact,[20] and responses to our inquiries on this subject during oral argument were not illuminating. Moreover, the two counts before us were based on out-of-court publications which the petitioner signed without reference to his official capacity. Only in the letter sent directly to the grand jury room did the petitioner indicate in the statement that he was sheriff, and the Court of Appeals held that this statement did not present a clear and present danger to the administration of the law. In the light of this finding it is difficult to understand how the fact that the petitioner was sheriff of the county can be considered significant as to his news releases.

However, assuming that the Court of Appeals did consider to be significant the fact that petitioner was a sheriff, we do not believe this fact provides any basis for curtailing his right of free speech. There is no evidence that the publications interfered with the performance of his duties as sheriff or with his duties, if any he had, in connection with the grand jury's investigation. We are not dealing with a situation where a sheriff refuses to issue summonses or to maintain order in the court building; nor, so far as the record shows, did the petitioner do any act which might present a substantive harm to the jury's solution of the problem placed before it. We are dealing here only with public expression.

The petitioner was an elected official and had the right to enter the field of political controversy, particularly

---

[20] The decision of the Court of Appeals, affirming the overruling of petitioner's demurrer to the effect that the allegation quoted in note 19 was irrelevant and should be stricken, is of no weight in light of the trial court's failure to make a finding of fact either that the statements were issued in petitioner's official capacity or that the fact he was sheriff was relevant.

where his political life was at stake.[21]   Cf. *In re Sawyer,*
360 U. S. 622.   The role that elected officials play in our
society makes it all the more imperative that they be
allowed freely to express themselves on matters of current
public importance.

Our examination of the content of petitioner's state-
ments and the circumstances under which they were pub-
lished leads us to conclude that they did not present a
danger to the administration of justice that should vitiate
his freedom to express his opinions in the manner chosen.

*The judgment is reversed.*

Mr. Justice Frankfurter took no part in the decision
of this case.

Mr. Justice White took no part in the consideration
or decision of this case.

Mr. Justice Harlan, whom Mr. Justice Clark joins,
dissenting.

Whether or not the clear and present danger doctrine of
*Bridges* v. *California,* 314 U. S. 252, 260–263, 271, should
be deemed to limit a state or federal court's use of the con-
tempt power when employed against a member of its
official entourage who has scandalized the conduct of the
court in relation to and during the course of a pending
judicial proceeding is a question which I need not reach
in this case.   For even under the most expansive view
of *Bridges* and its offshoots the contempt judgment
against this sheriff should be upheld.

---

[21] Petitioner was not a civil servant, but an elected official, and
hence this is not a case like *United Public Workers* v. *Mitchell,* 330
U. S. 75, in which this Court held that Congress has the power to
circumscribe the political activities of federal employees in the career
public service.

396

Over fifty years ago Mr. Justice Holmes wrote: "The theory of our [judicial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado,* 205 U. S. 454, 462. For this reason this Court has repeatedly held that a criminal conviction based on the verdict of jurors influenced by extrajudicial statements of the case cannot stand consistently with due process of law. *E. g., Irvin* v. *Dowd,* 366 U. S. 717. But invalidation of a proceeding so infected is not the only remedy available to combat interference with judicial processes; so to hold would confer a right to frustrate those processes with impunity. And so it is that this Court has uniformly upheld the power of courts to protect themselves by citations for contempt from improper influence upon proceedings before them. Sustaining this power against a claim of freedom of speech in *Patterson* v. *Colorado, supra,* 205 U. S., at 463, Mr. Justice Holmes wrote: "When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied." The right of free speech, strong though it be, is not absolute; when the right to speak conflicts with the right to an impartial judicial proceeding, an accommodation must be made to preserve the essence of both. Thus in *Bridges* v. *California, supra,* 314 U. S., at 271, the Court said:

"The very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. . . . We must therefore turn to the particular utterances here in question and the circumstances of their publication to determine to

what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment."

And again in *Pennekamp* v. *Florida,* 328 U. S. 331, 347: "Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action." See *Craig* v. *Harney,* 331 U. S. 367, 372–373.

The Court professes to recognize these principles. It holds nevertheless that the contempt sanction cannot be applied in this case, arguing both that "the limitations on free speech assume a different proportion when expression is directed toward a trial as compared to a grand jury investigation," *ante,* p. 390, and that the findings of clear and present danger are unsupported by the record. I cannot agree with either proposition.

## I.

The grand jury is an integral part of the judicial process, *Levine* v. *United States,* 362 U. S. 610, 617; *Gates* v. *State,* 73 Ga. App. 824, 826, 38 S. E. 2d 311, 312; contempt sanctions are available to protect its functions. *Levine* v. *United States, supra.* Congress has recognized the need for safeguarding the deliberations of federal grand juries by making it a crime to attempt to influence a federal grand juror by extrajudicial communication.[1]  Even

---

[1] "Whoever attempts to influence the action or decision of any grand or petit juror of any court of the United States upon any issue or matter pending before such juror, or before the jury of which he is a member, or pertaining to his duties, by writing or sending to him any written communication, in relation to such issue or matter, shall be fined not more than $1,000 or imprisoned not more than six months, or both.

"Nothing in this section shall be construed to prohibit the communication of a request to appear before the grand jury." 18 U. S. C. § 1504.

assuming that a State may constitutionally permit a grand jury, unlike a petit jury, to be influenced by extrajudicial statements, a question explicitly left open in *Beck* v. *Washington*, 369 U. S. 541, 546, it certainly does not compel them to that course.

The Court does not dispute this. But, says the Court, no individual is on trial here; and "When the grand jury is performing its investigatory function into a general problem area, without specific regard to indicting a particular individual, society's interest is best served by a thorough and extensive investigation, and a greater degre · of disinterestedness and impartiality is assured by a : · ,w-ing free expression of contrary opinion." *Ante,* p. ઝੰ 2 This, however, is surely a policy decision with respect to which a State may legitimately take a different view. Tੌ c Court does not suggest that Georgia was attempting to use the mantle of judicial proceedings in order to insulate the transaction of nonjudicial business from criticism; investigation is a traditional function of the grand jury. I see no reason why the State cannot determine for itself what shall and what shall not be considered by grand jurors in conducting any of their traditional tasks. Moreover, it is not the fact that individual rights were not at stake in this proceeding. The judge charged the jury:

> "if there is sufficient evidence of unlawful acts, then all parties participating, white and colored, candidates or non-candidates, should be indicted by this Grand Jury so that the guilty parties, if there are any, may be brought to trial."

That petitioner's statements would tend to aid rather than to prejudice implicated individuals was equally true in *Bridges* v. *California, supra,* but was rightly afforded no significance; the State as well as the individual is entitled to a day in court.

It is not suggested that in declaring that grand jurors shall be protected from improper "outside" influence

Georgia has improperly departed from her own prior law. Nor could it well be maintained that the Georgia courts undertook to judge petitioner's conduct in terms of something other than the *Bridges* clear and present danger standard. The Georgia Court of Appeals held:

"With respect to the question as to whether these acts of the defendant constituted a clear, present, or imminent danger or serious threat to the administration of justice, it is to be noted that the citation as amended so charges, the court below has by its conviction so found, and the evidence supports the finding." 103 Ga. App., at 321; 119 S. E. 2d, at 273.

To be sure this holding cannot preclude this Court from examining the evidence for itself. But this does not mean that it may do so with the same latitude as if it were sitting as a state court of review. The Court's functions are exhausted once it is determined that federal constitutional standards have been met. It is of course not incumbent on the state courts to deal in detail with the facts of this Court's earlier decisions in order to "display an awareness of the standards enunciated in those cases," or to make "elaborate findings" to demonstrate *"how* the publications interfered with the grand jury's investigation." *Ante,* pp. 386–387.

Accepting as I do for present purposes the *Bridges* test, this conviction must be upheld if the record supports the inference of clear and present danger.

## II.

That test is amply met here. Petitioner, a public official connected with the court, accused, from his office in the courthouse, the Superior Court judges of fomenting race hatred; of misusing the criminal law to persecute and to intimidate political and racial minorities; of political naiveté, racial prejudice, and hypocrisy. He

compared the calling of the grand jury to the activities of the Ku Klux Klan. He made an undisguised effort to influence the outcome of the investigation by declaring that only the politically naive could believe Bibb County Negroes might be guilty of selling votes. It was stipulated that both of petitioner's formal statements were read by the grand jurors during the course of their investigation.

The Court considers this evidence insufficient because there was no showing of "an actual interference with the undertakings of the jury," that the jurors "felt unable or unwilling to complete their assigned task because petitioner 'interfered' with its completion," that "the investigation was not ultimately successful or, if it was not, that the petitioner's conduct was responsible for its failure." *Ante*, p. 387. Surely the Court cannot mean that attempts to influence judicial proceedings are punishable only if they are successful. Speech creating sufficient danger of an evil which the State may prevent may certainly be punished regardless of whether that evil materializes. See *Feiner* v. *New York*, 340 U. S. 315, 320–321. Indeed, the test suggested by the Court is even more stringent than that which it applies in determining whether a conviction should be set aside because of prejudicial "outside" statements reaching a trial jury. In such cases, although the question is whether the rights of the accused have been infringed rather than whether there has been a clear and present danger of their infringement, it is necessary only to show a substantial likelihood that the verdict was affected, and it is no answer that each juror expresses his belief that he remains able to be fair and impartial. *Irvin* v. *Dowd, supra*, 366 U. S., at 728; cf. *Marshall* v. *United States*, 360 U. S. 310, 312–313; *Spano* v. *New York*, 360 U. S. 315, 324. The test for punishing attempts to influence a grand or petit jury should be less rather than more stringent.

I cannot agree with the Court that petitioner's statements would have been likely to affect the outcome of the investigation "only if the charge was so manifestly unjust that it could not stand inspection." *Ante,* p. 391. This is to discredit the persuasiveness of argument, which the Court purports to value so highly. Any expression of opinion on the merits of a pending judicial proceeding is likely to have an impact on deliberations. In this instance that likelihood was increased by two factors which were not present in *Bridges, Pennekamp,* or *Craig,* in which the Court held the evidence insufficient to show clear and present danger. None of those cases involved statements by officers of the court; and all concerned statements whose alleged interference was with the deliberations of a judge rather than a jury. Georgia law requires the sheriff to execute and return court processes and orders and to preserve order during sessions of the courts. Ga. Code Ann., 1959, § 24–2813. Petitioner was thus a law-enforcement officer, whose office was in the very courthouse where the grand jury was sitting. Whether or not he issued the statements "in his capacity as sheriff," and whether or not the contempt citation alleged it, his words assumed an overtone of official quality and authority that lent them weight beyond those of an ordinary citizen.

Of equal if not greater importance is the fact that petitioner's statements were calculated to influence, not a judge chosen because of his independence, integrity, and courage and trained by experience and the discipline of law to deal only with evidence properly before him, but a grand jury of laymen chosen to serve for a limited term from the general population of Bibb County. It cannot be assumed with grand jurors, as it has been with judges, *Craig* v. *Harney, supra,* 331 U. S., at 376, that they are all "men of fortitude, able to thrive in a hardy climate." What may not seriously endanger the independent delib-

erations of a judge may well jeopardize those of a grand or petit jury. See *Maryland* v. *Baltimore Radio Show, Inc.*, 338 U. S. 912, 920 (opinion of FRANKFURTER, J.).

Moreover, the statements themselves were of such a nature as to distinguish this case from *Bridges, Pennekamp*, and *Craig.* It cannot be said here, as it was in *Bridges*, that petitioner's charges of racial bias, hypocrisy, political intimidation, persecution, and political naiveté, and his comparison of the judges with the Ku Klux Klan, "did no more than threaten future adverse criticism which was reasonably to be expected anyway," or that "if there was electricity in the atmosphere, it was generated by the facts; the charge added by the . . . [petitioner's statement] can be dismissed as negligible." 314 U. S., at 273, 278. The sheriff's remarks were not, as in *Pennekamp*, 328 U. S., at 348, general criticisms with respect to rulings already made, but specific attacks directed toward the disposition of the pending investigation. They cannot be characterized, as in *Craig*, 331 U. S., at 374–375, as merely unfair reports of the activities of others; unlike the editorial in that case, *id.*, at 376–377, petitioner's criticisms went squarely to the merits of the investigation and impugned as well the motives and honesty of those conducting it. I do not understand how it can be denied that a grand juror, reading in the course of this investigation the sheriff's statement that the judges who instructed the grand jury to undertake it were racial bigots making discriminatory use of the laws for purposes of political repression, and that the charges themselves were incredibly false, might well be influenced in his deliberations.

The petitioner's last formal statement, which he and the Court characterize as a "defense," was also properly found to constitute a contempt. Defenses, like charges, should be presented to a court judicially and not through the public press. But in fact the affirmance of petitioner's conviction was not based at all on the allegation

that this defense interfered with *his* trial for contempt. Rather, the Court of Appeals held that this further statement had been made "in an apparent effort to hamper the grand jury which was still considering the charges given it by the court." 103 Ga. App., at 321, 119 S. E. 2d, at 273. This conclusion, based on the repetition of a number of petitioner's previous statements and the allegation that they were true,[2] was clearly justified.

---

[2] Petitioner's last statement was as follows:

"My defense will be simply that I have spoken the truth. Anyone who will read, point by point, my statements concerning the Judges' charge will find those statements true.

"The Judges were wrong to use 'Negro Bloc Voting', the campaign slogan of Talmadge, and similar phrases as language with which to instruct a Grand Jury. When I stated 'It is shocking to find a Judge charging a Grand Jury in the style and language of a race baiting candidate for political office' was it contempt of court or was I pointing out the truth?

"When I said 'If anyone in this community be free of racial prejudice, it should be our Judges' was this contempt of Court or was I stating a truth?

"The Judges were morally wrong to suddenly order a Grand Jury to single out the Negro political leaders for indictments under a forgotten law which even judges have violated. When I said 'It further seems that [*sic*] the height of hypocrisy to dust off an old blue law that has been ignored for fifty years and suddenly order its rigid enforcement against a minority group of voters' was this contempt of Court or was I speaking the truth?

"The Judges were professionally wrong in involving the Court in political affairs. I stated that the Judges' charges 'threaten political persecution carried out under the guise of law enforcement' and further that 'this action appears either as a crude attempt at judicial intimidation of Negro voters and leaders, or, at best, as agitation for a "Negro Vote" issues [*sic*] in local politics.' Can anyone read the Judges' instructions for indictments under the old 'influencing voters' law and honestly say no political persecution is threatened when almost all office holders have violated this law? Can anyone read the long charge reciting political rumors and charges against Negro leaders and voters and honestly say there is no appearance of any attempt at intimidation of Negro voters and leaders? Likewise can anyone deny

Finally, petitioner's case is not saved by the fact that both he and the judges he attacked are elected officials, or by the fact that the statement concerned an issue of some political moment. There was ample opportunity to bring the judges' performance to the voters after the investigation was closed. "Political interest" cannot be used as an excuse for affecting the result of a judicial inquiry.

I would affirm.

---

such a charge and such an investigation in the midst of local political races agitates a 'Negro Vote' issue?

"If the Court will permit I believe that many thousands of witnesses would testify in my behalf that they drew the same conclusions as I from the language used by the Judges in their charge.

"Is it just, or even fair play, for the Judges to say they intended no threat, no intimidation, no agitation and therefore it is contempt of court to publicly state honest, sincere conclusions and practical effects caused by the language of the charge.

"Two wrongs do not make a right, and the Judges are wrong to cite me for contempt. I cannot view the Judges' action in any light except to believe I am to be prosecuted for daring to criticise the Judges and for speaking the truth.

"I had hoped that the entire ill-will and race agitation stirred up by the Judges' charge would be permitted to die after a face-saving presentment by the Courts' Grand Jury. To this end I remained silent despite grossly false and discrediting conclusions presented. Now it appears that the Judges want the satisfaction of find [*sic*] me in contempt of court, but if they so do, they are in effect saying that the court has done no wrong because the court itself finds it has done no wrong.

"/s/ James I. Wood"