**Carol W. THOMAS, Petitioner-Appellant,**

**v.**

**Joe M. CREVASSE, Jr., Sheriff of Alachua County, Florida, Respondent-Appellee.**

**No. 26935.**

United States Court of Appeals
Fifth Circuit.

June 26, 1969.

Rehearing Denied and Rehearing En
Banc Denied Aug. 19, 1969.

Jerome J. Bornstein, Orlando, Fla., for appellant.

Earl Faircloth, Atty. Gen. of Florida, Raymond L. Marky, Jr., George R. Georgieff, Asst. Attys. Gen., Tallahassee, Fla., for appellee.

Before TUTTLE and GEWIN, Circuit Judges, and COMISKEY, District Judge.

COMISKEY, District Judge:

We review here the denial of a petition for a writ of habea corpus filed by appellant, Carol W. Thomas, who had been found guilty of contempt of court.[1] Appellant's conviction arose out of an incident involving the Alachua County, Florida Grand Jury. Appellant had complained publicly that Negro women imprisoned in the Gainesville, Florida City Jail were being sexually molested by certain law enforcement officials. On

---

1. On April 12, 1968, a panel of this court (Judges Thornberry, Ainsworth and Dyer) directed the United States District Court for the Northern District of Florida "to enter an order granting bail in the amount of $1,000" to appellant and Irvin Lee Dawkins (with whom we are not concerned in this appeal) "pending disposition of the appeal from the Florida State convictions through the exhaustion of such remedies and appellate procedures as are available to appellants and provided such proceedings are carried on with due diligence to a prompt conclu-.sion."

December 11, 1967, the Alachua County Grand Jury was called into session to investigate these charges. This Grand Jury consisted of thirteen Caucasians and five Negroes. While the Grand Jury was in session considering this matter, or during a recess, one Irven Lee Dawkins, distributed four copies of a publication called "Black Voices", of which he and appellant were the co-authors, to four persons in the hallway adjacent to the Grand Jury room. This publication was a mimeographed, two-page handbill. An article in this publication, which had been written by Dawkins, stated in part:

"The so-called authorities of Gainesville are at their old trick again. They have called together a grand-jury to investigate charges made by Black people against that racist, Klan-infested police department. Well, gather round, let me tell you this; that grand-jury is just about as racist and Klan infested as the police department is. I told you before that when they got through lying, fixing, framing, and denying—*nothing* was going to be done! Look who's sitting on the jury. What they will probably do is put in a couple of Uncle Toms to make their findings justifiable. If there are any Uncle Toms on that grand-jury, we all know who they will be.

"By them housing female prisoners in the County Jail is not going to solve the issues; just one of them. In the meantime that sadist Wilderson gets off scott-free. And Ted Duncan —I don't have to tell you about that negro-hating hunkie, I think you already know. And ex-mayor McKinney —he's worse. A lying, no-good, recist if I ever saw one. He reminds me of 'Bull' Conner.

"There are people who are going to be subpoenaed to come to this fixed grand-jury, including myself. Many people are afraid to go—which shows

WHITE POWER again. WE ARE ASKING THAT EVERYONE IN GAINESVILLE WHO IS MAN AND WOMAN ENOUGH TO STAND UP AND FIGHT AGAINST THIS OPPRESSIVE CITY AND COUNTY GOVERNMENT COME FORWARD AND TESTIFY ON MONDAY, DEC. 18 AT 9:30 A.M. By the way, there are those so-called negro-leaders in Gainesville. You know these things have been going on, but you are afraid to stand up. So stay in your chairs, we know you are a part of white oppression." [2]

In addition to the four copies of "Black Voices" distributed in the hall next to the Grand Jury room by Joe Dawkins, the appellant and Dawkins distributed other copies of this publication elsewhere in the city of Gainesville.

On December 27, 1967, the appellant and Dawkins were found guilty of contempt of court in the Circuit Court of Alachua County and sentenced to six months in the County Jail. The Judge who passed judgment and pronounced sentence found that the publication could have fallen into the hands of witnesses who were to appear before the grand jury and the members of the grand jury. The Judge said that the statements in the publication about "Uncle Toms" on the grand jury "constitutes a veiled threat to the members of the grand jury who are of the colored race." [3] The The Judge further found that this publication was "intended to interfere with the administration of justice. * * * "[4] This ruling was affirmed by the First District Court of Appeal of the State of Florida on March 7, 1968. The case was appealed to the Florida Supreme Court but was dismissed because of lack of jurisdiction on April 23, 1968. The United States Supreme Court denied certiorari on October 14, 1968.

On October 30, 1968, the appellant filed a petition for a writ of habeas corpus in the United States District Court

---

2. Appellant's exhibit A–7.

3. Record, page 9.

4. Record, page 10.

for the Northern District of Florida. This petition was denied by the District Judge, who agreed that the appellant's conduct constituted a veiled threat. The District Judge held that the right of freedom of speech does not extend so far as to allow a person to attempt to affect the outcome of grand jury deliberations by threat and intimidation. The District Judge concluded that the attempt to interfere with the grand jury's deliberations constituted a clear and present danger to the administration of justice.

We cannot agree with the District Court's holding and therefore reverse. The Supreme Court was faced with the conflict between freedom of the press and the orderly administration of justice in Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). In this case the Court applied the "clear and present danger" test, which had been formulated in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), to published comments about pending litigation and said, "What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." 314 U.S., at 263, 62 S.Ct., at 194. This principle has been adhered to by the Supreme Court in subsequent cases. In Pennekamp v. State of Florida, 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946), the Court said, "In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." The Bridges case was also followed in Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).

The most recent case on this issue, and also the decision most relevant to this appeal, is Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In the Wood case, as in the case before us, the Supreme Court was faced with a contempt conviction arising out of published comments pertaining to a grand jury investigation. The Court not only adhered to the principles enunciated in Bridges, Pennekamp, and Craig v. Harney, but emphasized the importance of preserving freedom of speech and press when it pertains to a grand jury investigation of issues of public concern in the following language:

"Historically, this body [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused * * * to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. Particularly in matters of local political corruption and investigations is it important that freedom of communication be kept open and that the real issues not become obscured to the grand jury. It cannot effectively operate in a vacuum.

\* \* \* \* \* \*

"The administration of law is not the problem of the judge or prosecuting attorney alone, but necessitates the active cooperation of an enlightened public. Nothing is to be gained by an attitude on the part of the citizenry of civic irresponsibility and apathy in voicing their sentiments on community problems. * * * The first Amendment envisions that persons be given the opportunity to inform the community of both sides of the issue under such circumstances.

\* \* \* \* \* \*

"* * * When the grand jury is performing its investigatory function into a general problem area, without specific regard to indicting a particular individual, society's interest is best served by a thorough and extensive investigation, and a greater degree of

disinterestedness and impartiality is assured by allowing free expression of contrary opinion. Consistent suppression of discussion likely to affect pending investigations would mean that some continuing public grievances could never be discussed at all, or at least not at the moment when public discussion is most needed." 370 U.S., at 390–392, 82 S.Ct., at 1373–1374.

In view of the above cases, the language contained in "Black Voices" would have to constitute an extremely serious threat to the grand jury deliberations in order to justify the contempt conviction. This is especially true in view of the fact that the grand jury investigation in the case before us was certainly concerned with a matter of grave public concern—the alleged sexual molestation of Negro women imprisoned in the city jail.

With this principle in mind we now examine the above-quoted three paragraphs published in "Black Voices" which gave rise to appellant's conviction. We do not believe that the second and third paragraphs constitute even a remote danger to the fair administration of justice. In the second paragraph the writer does make vicious attacks upon certain persons. But while this language is vitriolic, this is not enough to constitute a clear and present danger to the fair administration of justice within the meaning of *Bridges* and its progeny. "The vehemence of the language used is not alone the measure of the power to punish the contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." Craig v. Harney, *supra*, 331 U.S., at 376, 67 S.Ct., at 1255. We can find no threat or other device to obstruct the grand jury's investigation in this paragraph.

The third paragraph offers an even weaker ground for a contempt convic-tion. Here, the writer is only asking that all people who have information which could support indictments come forward and testify before the grand jury. In absence of a threat against witnesses who fail to testify or who testify adversely to the writer's viewpoint, we do not see how this can possibly be construed as a threat to the grand jury's investigations. We find no hint of reprisals against people who do not testify or who testify in defense of the jail officials. Indeed, the publication "Black Voices" does not purport to represent any group which could carry out such reprisals. Rather, it evidently represents only the views of the two writers —the appellant and Jack Dawkins.

The latter part of the first paragraph is the only part of the language in question which can possibly be construed as a threat to the grand jury's investigation. This first paragraph begins with a vehement denunciation of the authorities of Gainesville and the "racist, Klan-infested police department." The writer then says that the grand jury "is just as racist and Klan infested" as the Police department and that it would not return indictments or reach any conclusions supporting the appellant's charge but would instead content itself with "lying, fixing, framing, and denying." The paragraph closes with this statement:

"Look who's sitting on the [grand] jury. What they will probably do is put in a couple of Uncle Toms to make their findings justifiable. If there are any Uncle Toms on that grand-jury, we all know who they will be." [5]

Of the eighteen members of the grand jury, five were Negroes. As we noted above, the state trial judge called this language "a veiled threat" to the Negro members of the grand jury, and the United States District Judge who denied appellant's petition for a writ of habeas corpus agreed.

But, as was true of the second paragraph, this language and the rest of the first paragraph does not contain any

5. See note 1, *supra*.

real threat to the members of the grand jury—white or Negro. The only "threat" it makes is that if the grand jury does not return any indictments on the basis of appellant's allegations, the authors of "Black Voices" will regard the white members of the grand jury as "racists" and Ku Klux Klan sympathizers and the Negro members as "Uncle Toms." As we said above, this publication did not purport to represent any group but apparently contained only the opinions of the two writers. The most that can be said about the language in the first paragraph is that it threatened to violently criticize the grand jurors if they did not return indictments. It "did no more than threaten future adverse criticism which was reasonably to be expected anyway" if indictments were not returned. Bridges v. State of California, *supra*, 314 U.S., at 273, 62 S.Ct., at 198. We therefore hold that this language did not constitute such a clear and present danger to the grand jury deliberations so as to justify the conviction of the appellant for contempt of court.

The judgment of the District Court is therefore reversed and the case is remanded with directions to vacate the judgment of conviction.

Reversed and remanded with directions.

ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.