AMERICAN SAMOA GOVERNMENT, Plaintiff

v.

IGNATIUS GODINET, Jr., Defendant

ALEX GODINET and FRANK GODINET,
Respondents to Order to Show Cause

High Court of American Samoa
Trial Division

CR No. 62-87

May 2, 1988

Before REES, Chief Justice, AFUOLA, Associate Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiff, James Doherty, Assistant Attorney General
For Defendant Ignatius Godinet, Aitofele Sunia
For Respondents on Order to Show Cause, Togiola T.A. Tulafono

On Motion for Reconsideration or New Trial:

On November 28, 1987, a fifteen-year-old girl went to the police station and gave a lengthy statement detailing the circumstances of her alleged rape the previous night by Ignatius Godinet, Jr. Godinet was arrested and became the subject of a criminal prosecution. On the partial basis of the girl's testimony at the preliminary examination before the District Court, Godinet was

128

bound over to the High Court on charges of rape, sodomy, and sexual assault. The Chief Justice of the High Court ordered that trial be set for January 19, 1988. The girl was to be the principal witness for the prosecution. Another alleged eyewitness, a fifteen-year-old boy whose prior statement and preliminary examination testimony had substantially corroborated the girl's charges, left the Territory shortly thereafter for an undisclosed destination.

Four days before the date scheduled for trial, the complaining witness met with the prosecuting attorney and presented to him a handwritten and signed note given to her the night before by three relatives of the defendant. In the note those relatives promised to ensure that Ignatius Godinet would leave the territory and would never bother the girl again. It was clear that this assurance was given in exchange for the girl's refusal to testify; the note purported to grant or reserve to her "the right to reopen this case" should the defendant return to the Territory.

No subpoena had yet been issued to the complaining witness. This failure, however, was apparently due only to the fact that no one had believed it necessary. The girl had approached the police on her own. She had fully cooperated with the Attorney General's office in its preparation of the case. She had testified at the preliminary examination. When she informed the government of the agreement she had reached with the defendant's relatives, the government immediately sought to compel her appearance by issuing a subpoena. The girl did, however, fulfil her side of the bargain by disappearing, and the case against Ignatius Godinet was subsequently dismissed.

On January 26, 1988, the relatives who had signed the agreement appeared before this Court to show cause why they should not be held in contempt of court. Their principal defense was that the agreement had originally been the girl's idea rather than their own. Two of the relatives, Alex and Frank Godinet, were nevertheless held to be in contempt. The Court explained that a criminal trial is not simply a private matter between the alleged victim and the defendant or his family, and that anyone who enters into an agreement whose purpose is to deprive the Court of its ability to proceed by making evidence unavailable thereby

places himself in contempt of Court regardless of whether the agreement was originally his own idea or someone else's. The Court further noted that the alleged ringleader in the incident was a fifteen-year-old girl and that Alex and Frank Godinet are adults who should have resisted any suggestion by her to enter into an illegal agreement. The Court did, however, accept their testimony about the circumstances of the agreement as tending to mitigate the offense and therefore suspended the six-month sentence.

Counsel for Alex and Frank Godinet now moves for a reconsideration of the holding that they were in contempt, or in the alternative for a new trial.

Counsel's arguments can be distilled to two. First, counsel urges that the territorial statute purporting to give the Court power to punish contempt, A.S.C.A. § 3.0302(3), does not in fact confer authority to punish any particular kind of conduct. Rather, in order to be punishable as contempt an action must be prohibited by the separate contempt statute in the criminal code, A.S.C.A. § 46.4617. Second, since the witness had not been served a subpoena at the time of the agreement that she would not testify, there was no "process" of the Court for the agreement to have impeded.

The first argument is founded on a misunderstanding of the nature of the Court's power to punish contempt. Courts necessarily possess the inherent ability to take steps to ensure the integrity of the process by which they decide the cases before them.

> [T]he right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government and . . . courts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions.

Wood v. Georgia, 370 U.S. 375, 383 (1962). In other words, the High Court could hold someone in contempt even if there were no statutes at all. It happens that the Fono has affirmed this power by enacting A.S.C.A. § 3.0203. It has also enacted a separate statute, A.S.C.A. § 46.4617, which makes certain contumacious acts punishable by ordinary

130

criminal prosecution. The criminal statute, which vests discretionary power in the executive to prosecute certain kinds of conduct, in no way diminishes the Court's power to act on its own initiative under the former statute. Cf. Steinert v. United States District Court for the District of Nevada, 543 F.2d 69, 70 (9th Cir. 1976) (18 U.S.C. § 401, a federal statute similar to A.S.C.A. § 3.0203, may give rise to criminal liability despite the existence of a separate statute making certain contumacious acts criminal offenses). Here lies the answer to the argument that A.S.C.A. § 3.0203 is "not capable of violation."

The defendants next argue that, since no subpoena had yet been served on the witness, their efforts to ensure her absence could not have been contumacious of the Court's authority. This argument assumes not only that the term "process" as it appears in A.S.C.A. §§ 3.0203 and 46.4617 must mean an affirmative and explicit command from the Court, but also that it is only possible to "resist" process that has already been formally issued.

The first of these two propositions --- that "resistance to process" should be narrowly construed to mean only the encouragement of disobedience to a subpoena rather than comprehending any deliberate obstruction of the process by which the Court conducts its business --- has support in at least one judicial opinion from another jurisdiction. See Sellers v. State, 90 So. 716 (Miss. 1922). We are inclined, however, to disagree with the holding in Sellers for the reasons stated in the vigorous dissent to that opinion and in the cases and other authorities cited therein. The phrase in our contempt statute on which defendants in this contempt proceeding rely, defining contempt to include in pertinent part "disobedience or resistance to [the Court's] lawful writ, process, order, rule, decree, or command,"[1] seems to have been designed to restate

---

[1] The quoted language is from A.S.C.A. § 3.0203(3). The statute on which defendants in contempt contend this proceeding should be based, A.S.C.A. § 46.4617(3), forbids "intentional disobedience or resistance to the process,

131

and incorporate the common law definition of contempt, under which efforts to secure the absence of a witness were contumacious regardless of whether the witness had been served with a subpoena. See Sellers, supra, at 717-22 (Ethridge, J., dissenting), and authorities cited therein.

Ultimately, however, we need not decide whether "process" means the judicial process itself or only a subpoena or other paper emanating from that process. For in this case a subpoena actually did issue, albeit a few days after the agreement between the defendants and the witness. The question before us, as formulated by the defendants themselves, is whether the agreement constituted "resistance to" that subpoena. This is a question of contractual interpretation. Surely a contract that explicitly required the girl to disobey any subpoena that might thereafter be issued would be a

---

injunction, or other mandate of a court." For the purposes of determining whether defendants in contempt engaged in "resistance to process," the two statutes would appear to be identical. Defendants contend, however, that "process" in § 46.4617 refers back to a preceding section having to do with the obstruction of process servers, which defines "process" as "any writ, summons, subpoena, warrant other than an arrest warrant, or other process or order of a court." A.S.C.A. § 46.4616. We disagree with this contention. A statute making it illegal to obstruct process servers necessarily contemplates "process" only in the sense of papers issued by a court. For the reasons discussed in the text of this opinion, "the process . . . of a court" within the meaning of a contempt statute would seem to have a far broader meaning. As discussed in the text, however, it is not necessary for us to resolve this question, since defendants committed contempt even within the narrow construction they urge us to adopt.

form of "resistance to" such a subpoena, notwithstanding the chronological order of the two documents. Cf. Montgomery v. Palmer, 59 N.W. 148 (Mich. 1894) (convincing witness to avoid service of a subpoena held to be contumacious under statute defining contempt in pertinent part as "unlawful interference with the process" of the court). The question in this case, therefore, is whether the parties to the agreement intended the girl to absent herself only in the event she received no subpoena. Such a construction would seem absurd. It is certainly at odds with the construction the girl herself put on the agreement: almost immediately after being served with the subpoena she dropped out of sight and subsequently wrote a letter to Ignatius Godinet's lawyer, stating, "I only intend to honor my word and keep at peace with a family." It defies logic to suggest that the defendants have not resisted the process of the Court merely because they got to the witness before the subpoena did.

In any case, even if we found that the defendants in contempt resisted no "process," they certainly resisted an "order" of the Court and therefore committed contempt within the definition of A.S.C.A. §§ 3.0203. (See also A.S.C.A. § 46.4617(3) (emphasis added): contempt includes "intentional disobedience or resistance to the process, injunction, or other mandate of a court.") On December 9, 1987, well before the date of the agreement between the Godinets and the prospective witness, the Court ordered that Ignatius Godinet be tried on January 19, 1988 for two counts of forcible rape, one count of forcible sodomy, and one count of sexual abuse in the first degree. The whole purpose of the agreement into which the Godinets subsequently entered, as evidenced by its language and by the testimony of the defendants themselves at the contempt hearing, was to prevent that trial from taking place. This was "resistance to" the Court's lawful order.

Notwithstanding our disagreement with the defendants' proposed definition of contempt, we will grant their motion for a new trial. The earlier proceeding was necessarily held on short notice; defendants and their counsel, possibly because of inadequate time for preparation, seem not to have appreciated the legal standards that were to be applied and may therefore not have offered all the evidence they might otherwise have

133

wished to offer. The judgment and the suspended sentences will therefore be vacated and a rehearing of the order to show cause will be set for June 15, 1988.

It is so ordered.