UNITED STATES of America

v.

**Robert H. MARTIN, Charles H. Adams, Donald R. Bernard, and John V. Holden.**

Crim. No. H–78–13.

United States District Court,
S. D. Texas,
Houston Division.

Dec. 5, 1979.

882

Robert G. Clark and D. McCarty Thornton, Washington, D. C., for plaintiff.

Jake B. Clegg and Bruce L. James, Sam L. Sterrett, Jr., Ralph A. Modad, and Gerald M. Birnberg, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

STERLING, District Judge.

Presently pending before the Court are Defendants' motions in bar of prosecution and motions to dismiss the indictment. Defendants are charged with securities fraud, mail fraud, and conspiracy to defraud in connection with their activities in an alleged boiler room operation used to defraud purchasers of fractional working interests in oil and gas leases. This Court held a comprehensive evidentiary hearing on Defendants' motions. Based upon the evidence of the totality of the circumstances concerning the conduct of government attorneys from both the SEC and the U. S. Attorney's Office vis-a-vis these Defendants, this Court is of the opinion that the present indictment should be dismissed. Defendants' motions in bar of prosecution and to dismiss are based on (1) an alleged agreement with the SEC that they wouldn't be prosecuted; (2) the conduct of the U. S. Attorney's Office in bringing the indictment; and (3) a claim of collateral estoppel based on prior bankruptcy proceedings involving Tri-State Oil & Gas. (Defendants raised the issue of collateral estoppel after the evidentiary hearing was held by this Court.)

Defendants' motions in bar of prosecution as it pertains to the SEC are based on the entry of consent decrees in two SEC civil cases involving these Defendants: *SEC v. Petco Oil & Gas* and *SEC v. Tri-State Oil & Gas.* In *Petco,* a consent decree was entered into on May 3, 1976, by which Defendants Bernard and Holden were enjoined in a number of particulars from offering for sale oil and gas interests in connection with their activities with Petco. In *Tri-State,* a consent decree was entered into on September 22, 1976, by which Defendants Martin and Adams were enjoined from selling schedule D interests in connection with their activities with Tri-State Oil & Gas. The present indictment charges the Defendants, as owners, directors, officers, or as sales managers of Tri-State, with devising a scheme to defraud investors by obtaining funds for investment by means of false and misleading statements and then diverting large amounts of that money to their own use. Against this indictment, Defendants interpose an alleged agreement made between them and the SEC attorneys handling the *Petco* and *Tri-State* cases to the effect that by entering into consent decrees with the SEC, the Defendants could avoid potential criminal prosecution, and that the SEC would not make a criminal reference of the matter.

█ Courts have dismissed indictments brought in breach of an express agreement not to prosecute as a means of insuring that the criminal justice system is administered fairly. *United States v. Minnesota Mining and Manufacturing Co.,* 551 F.2d 1106 (8th Cir. 1977); *United States v. Rodman,* 519 F.2d 1058 (1st Cir. 1975); *United States v. Carter,* 454 F.2d 426 (4th Cir. 1972); *United States v. Phillips Petroleum Co.,* 435 F.Supp. 622 (N.D.Okl.1977). As the *Phillips Petroleum* court noted: "When the United States Government gives its word to or makes an agreement with one of its citizens, the Government must be held to that agreement and keep its promises." [at 640.]

In the analysis of agreements such as these, the principles of contract law are used to determine whether a binding agreement has in fact been made. The prerequisites to a legally binding agreement are satisfied when one party makes an offer and the party to whom the offer is made accepts. *Ingrassia v. Shell Oil Co.*, 394 F.Supp. 875 (S.D.N.Y.1975). An "offer" is defined as a promise upon an act, forbearance or return promise being given in exchange for the promise or its performance. *Interstate Industries, Inc. v. Barclay Industries, Inc.*, 540 F.2d 868 (7th Cir. 1976). The essence of any agreement is mutual assent and the existence of assent can only be reconstructed through evidence of words or deeds which objectively manifest the expression of assent. *Hodgson v. First Federal Savings & Loan Association of Broward County, Florida*, 455 F.2d 818 (5th Cir. 1972).

The evidentiary hearing conducted January 8 through 12 indicated that the conduct of the parties in both the *Petco* and *Tri-State* cases was nearly identical: an SEC civil suit was filed, extensive negotiations were had between the SEC attorneys and the attorneys for the Defendants; during the negotiations the Defendants' concern over possible criminal prosecution was discussed with the SEC attorneys; by entering into the consent decrees, these Defendants effectively took themselves out of the business of selling oil and gas interests; and all parties believed that the entry of the consent decrees would be dispositive of the whole matter and none of the parties anticipated that there would be a later criminal prosecution of these Defendants. In this last regard, the evidence produced at the hearing showed that the SEC attorneys in *Petco* promised Bernard and Holden that the entry of the consent decree would "wrap it all up" and that although neither of the SEC attorneys was in a position to offer a formal grant of immunity, that as a practical matter they did have the power over criminal referral. In the course of the *Tri-State* negotiations, the Chief SEC attorney told an SEC accountant who was pressing for criminal reference that the case was not an appropriate one for criminal prosecution. This statement was made in the presence of Defendants' attorney. A *Tri-State* SEC attorney testified that he considered the case closed with the entry of the consent decree.

In interpreting the meaning of an agreement, the language used by the parties must be examined in light of the surrounding circumstances existing at the time the terms are negotiated. *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584 (5th Cir. 1976). Not only are such existing circumstances relevant in ascertaining the meaning of an agreement, but subsequent acts of the parties are also relevant to show the meaning of the words used. *Newburgh v. Florsheim Shoe Co.*, 200 F.Supp. 599 (D.Mass.1961). These well established concepts of contract law, now embodied in the Uniform Commercial Code's terms of "usage of trade" and "course of performance" [Tex.Bus. & Com.Code Ann. §§ 1.205(b) and 2.208(a)], help flesh out the meaning of the language used by the SEC attorneys in negotiating the civil consent decrees.

At the time these consent decrees were entered into, the local SEC office had historically handled securities fraud cases via the civil injunctive decree route rather than by criminal prosecution. Robert Axelrod, one of the SEC *Petco* attorneys, testified that the local SEC office believed that the civil mechanism was the best way to protect the investing public. Walter Gill, one of the SEC *Tri-State* attorneys, testified that he knew of no other case in which a criminal prosecution followed the entry of a consent decree. Kenneth Morris, attorney for Defendants in *Tri-State*, submitted an affidavit that he was not aware of any other case in which criminal charges were brought against defendants who had earlier entered into a civil consent decree with the SEC. The Court finds that these circumstances make Defendants' reliance on the SEC as the final arbiter as to criminal prosecution more reasonable.

The subsequent course of SEC conduct is consonant with the theory that the entry of the consent decrees closed the cases as far as the SEC was concerned. The *Petco* decree was made on May 3, 1976. On August 25, 1976, the SEC filed suit against Tri-State, but charged only Martin and Adams in connection with the Tri-State activities, in spite of the fact that Bernard and Holden were actively involved in the Tri-State operation, as evidenced by the present indictment which charges them in connection with these activities. Mr. Gill testified that he was surprised that the SEC did not name Bernard and Holden in the *Tri-State* case. Although the SEC complaint in *Tri-State* focused on the entry of preliminary and permanent injunctions, it did allege diversion of money from investors and prayed for any "further relief as may be required in the interest of justice and equity." Thus, the omission of Bernard and Holden from an SEC lawsuit in which a possible remedy was restitution: a lawsuit charging the Tri-State operation with which Bernard and Holden were intimately involved is evidence that the SEC was acting in conformance with a deal that the SEC book on Bernard and Holden was considered closed. After the entry of the second consent decree, the SEC ceased all of its activities connected with *Petco, Tri-State*, and its officers. SEC attorneys, who had been in attendance at the Tri-State Chapter XI bankruptcy proceedings, ceased attending. The SEC attorneys involved in *Petco* and *Tri-State* did not make formal criminal referrals in those cases.

 Based on the foregoing, the Court finds that the SEC attorneys did, in fact, make a deal with these Defendants. At a time when the SEC attorneys were aware of the Defendants' concern over possible criminal prosecution, the SEC attorneys promised the Defendants that by entering into consent decrees, the cases would be wrapped up. The Defendants reasonably believed that the SEC attorneys, as a practical matter, controlled the future course of any criminal prosecution. This belief was fostered by the past history of the local SEC office as well as the SEC attorneys handling the Petco and Tri-State cases. These Defendants bargained for a practical immunity from criminal prosecution and the SEC attorneys were aware of that intent, and it coincided with their intent that the civil consent decree would be dispositive of the matter. Although this loose language is not recommended as optimal as far as client protection is concerned, the Court finds that it did evidence the parties' meeting of the minds as regards criminal prosecution. Very similar language was used by a government attorney in *United States v. Phillips Petroleum, supra*. There the U. S. attorney apparently told one of the defendants, ". . . if you go ahead and sign the information . . then this will close the case once and for all." [at 625.] That Court held that the government had entered into an agreement which barred criminal prosecution, except for IRS violations which had been specially excepted from the deal. In *United States v. Rodman, supra*, the Court found that an express promise was made by the SEC that it would strongly recommend to the United States attorney that no prosecution against the defendant would be undertaken in exchange for testimony. The Court went on to hold that the failure of the SEC to comply with its agreement warranted dismissal of the indictment. The SEC attorneys in the present case went a step further: they promised that, as a practical matter, no criminal prosecution would occur. Having concluded that the SEC attorneys in *Petco* and *Tri-State* struck a deal with these Defendants barring future criminal prosecution as a practical matter, this Court must determine what effect, if any, should be given to that promise. In *Dresser Industries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979), the Court held that the federal government is not to be bound by a contract or agreement entered into by one of its agents unless that agent is acting within the limits of his actual authority. In so holding, the Court ruled that an agreement alleged to have been made between Dresser and the SEC precluding the Department of Justice from investigating

Dresser was unenforceable. In that case Dresser sought to enjoin the SEC and Justice Department from forcing Dresser to disclose details concerning allegedly questionable foreign payments. When Dresser filed its complaint the SEC and Justice Department had made informal requests for information from Dresser. The Fifth Circuit affirmed the district court's dismissal of the complaint on grounds of ripeness, except as to the alleged contract restraining the Justice Department which the Fifth Circuit said failed to state a claim. None of the cases relied on by the Fifth Circuit in *Dresser*, those being *Federal Crop Insurance Corporation v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), *Posey v. United States*, 449 F.2d 228 (5th Cir. 1971), and *Jackson v. United States*, 573 F.2d 1189 (Ct.Cl.1978), were criminal cases. *Dresser* was not a criminal proceeding either. In *Posey*, a tax refund case, the Fifth Circuit stated, "Regardless of the strong moral implications, it is well established that the Government is not bound by the unauthorized or incorrect statements of its agents." [at 234.] However, in the criminal context, federal courts must pay heed to the government's actions. It is well settled that federal courts have a supervisory function over criminal cases brought before them to insure that prosecutions are conducted fairly. It would be a complete abdication of the court's supervisory duty to allow the government to rely upon distinctions between express, implied, and apparent authority among its agents in avoiding the effect of its promise. *See, In re John Doe*, 410 F. Supp. 1163 (E.D.Mich.1976), where that Court noted, "The solution to agents who bargain away the government's rights is tighter administrative control within the executive branch." [at 1166]. *See, also, United States v. Rodman, supra.* This Court is of the opinion that while the agreement between the SEC and the Defendants does not bar this criminal prosecution, it is one factor to be considered in evaluating the fairness of the government's action.

· As noted above the *Petco* consent decree was entered into on May 3, 1976, and the *Tri-State* decree was entered into on September 22, 1976. Michael Brown, the assistant United States attorney who presented this case to the grand jury, testified that he picked up the *Tri-State* file from another U. S. attorney in August, 1977. Mr. Brown testified that he did not know how the file came to the U. S. Attorney's Office. This Court concludes that the reasonable inference is that the case was informally referred to the U. S. Attorney's Office by someone in the SEC in violation of the promises made by the SEC attorneys handling the *Petco* and *Tri-State* civil cases. In late November, 1977, this case took a bizarre turn when it became intertwined with a scheme by former Houston Police Chief Carroll Lynn to extract money from Jack Holden in return for the fixing of this indictment. In late November and throughout December, Mike Brown and Ed Lowenberg, an SEC attorney on loan to the U. S. Attorney's Office, readied this case for presentment to the grand jury. On January 16, 1978, J. A. "Tony" Canales, the U. S. Attorney for this District, learned that Carroll Lynn had sought $45,000 from Jack Holden on Lynn's representation that he could bribe Canales and insure that Holden would not be prosecuted. Mr. Canales, upon hearing this from Leonel Castillo, then head of the Immigration and Naturalization Service, was quite upset that Lynn was making those representations. Mike Brown testified that Canales did not instruct him to get an indictment of these Defendants, but instead left the matter entirely up to him. However, Brown did admit that his first reaction was to get an indictment right away to clear up this matter. After a brief presentation, of no more than one hour, to the grand jury on the last day of its term, the present indictment was returned. The grand jury was not informed of either the SEC agreement or the Carroll Lynn matter. No record was made of the presentation to the grand jury.

The historic purpose of the grand jury is to protect citizens from arbitrary or unreasonable prosecutions. *See, United States v. Colandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). This Court

recognizes that its role vis-a-vis the grand jury and the U. S. attorney is a limited one. Courts are not free to interfere with the prosecutorial discretion vested in the executive branch of our government by the United States Constitution. See, *United States v. Johnson*, 577 F.2d 1304 (5th Cir. 1978). However, this Court strongly feels that the indicting grand jury here was used to rubber stamp the wishes of the prosecutors in derogation of its duty to stand as an independent body placed between the prosecutor and the accused. *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In *Wood*, the Court stated that society needs an independent and informed grand jury. In *United States v. DeMarco*, 401 F.Supp. 505 (C.D.Cal.1975), aff'd 550 F.2d 1224 (9th Cir. 1977), a government attorney told the defendant that if he chose to assert his statutory venue right to be tried in California rather than in the District of Columbia, the prosecutor would secure an additional indictment against him in California. The district court dismissed that indictment on two grounds, the second being non-disclosure of that statement to the grand jury. In that regard the Court stated:

> "Despite the defendant's colorable claim that the indictment was the product of improper motives and the defendant's colorable claim that the charge in question had been the subject of improper threats, the prosecutor did not disclose to the grand jury that the charge could be attacked as an unjustifiable exercise of the charging power. The grand jury was entitled to be appraised of that information so that it could make an independent judgment as to whether it was appropriate to return an indictment under the circumstances." [at 513.]

The Ninth Circuit affirmed on the basis of the first ground decided by the district court and did not reach the second ground. This Court is persuaded that the failure of the United States attorney to inform the grand jury of the Carroll Lynn bribery scheme prevented the grand jury here from returning an informed and independent indictment. Had the grand jury been informed of the Lynn matter, it might have demanded a more thorough presentation of the prosecution's case and may have wanted to hear from the Defendants, at least one of whom was frustrated in his efforts to appear and testify before the grand jury by the lack of promised notice of when the case would be presented by the U. S. attorney. Instead, the U. S. attorney in charge of this matter rushed it through a grand jury in the space of one hour on the last day of its long term. The casual misuse of the grand jury in this fashion cannot be squared with the crucial role the grand jury is designed to play in our criminal justice system. *See, United States v. Gallo*, 394 F.Supp. 310, 314 (D.Conn.1975).

■ Although neither the SEC agreement nor the manner in which this case was presented to the grand jury alone might justify a dismissal of the present indictment, this Court is of the opinion that based on the totality of the circumstances presented here, the present indictment must be dismissed. *See, United States v. Braniff Airways, Inc.*, 428 F.Supp. 579 (W.D.Tex. 1977). In view of the foregoing, the Defendants' motion to dismiss based on the collateral estoppel effect of the bankruptcy proceedings involving Tri-State, which may not be without merit, need not be discussed nor need the question whether it was untimely filed. It is, therefore,

ORDERED that Defendants' motions to dismiss the indictment are GRANTED.