**In re Grand Juror Ronnie WEBB.**

**Grand Jury Panel 83–1.**

United States District Court,
N.D. Ohio, W.D.

May 24, 1984.

---

**3.** No relation to decedent.

Joseph M. Lawless, Ralph D. Martin, Public Integrity Section, Dept. of Justice, Criminal Div., Washington, D.C., for petitioner.

Brown, Baker, Schlageter & Craig by Harald F. Craig, Toledo, Ohio, for respondent.

\* The Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting in the Northern District of Ohio by designation.

1. 28 U.S.C. § 1363 gives district courts original jurisdiction of any civil action for the protection of a juror's employment under § 1875.

## OPINION

GILMORE, District Judge.\*

This matter is before the Court on an order to show cause why the Erie Supply Company of Norwalk, Ohio ("Erie") should not be found in violation of 28 U.S.C. § 1875 because of its discharge of Ronnie Webb, a member of a special grand jury empanelled in the Northern District of Ohio and under the control of this Court. For the reasons stated in this opinion, the Court finds that the respondent violated 28 U.S.C. § 1875 [1] and therefore must respond to the provisions of that statute.

28 U.S.C. § 1875 provides in pertinent part: "(a) No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States."

### I

Ronnie Webb is a member of a special grand jury empanelled by this Court upon designation by the Chief Judge of the Sixth Circuit Court of Appeals. He has served on that jury since its inception on March 2, 1983, and has been a regular attendant at its sessions, missing only a few meetings of the grand jury.[2]

Webb had been employed at Erie approximately two and a half years at the time he was empanelled as a member of the grand jury. He was originally hired to do counter sales, general maintenance, and to drive a truck. He did this type of work until the summer of 1983, at which time he was given additional responsibilities as an ad hoc manager of the main branch of the Company, located in Norwalk, Ohio.

2. From the time of its inception until the present time, the grand jury has usually met on Wednesdays and Thursdays every other week. Sometimes it would only meet on one day, and on rare occasions it would meet on a day other than Wednesday or Thursday.

During the autumn of 1983, Tim Altomare, the manager of Erie's Oberlin store, quit for a better-paying job, and at the time of his departure recommended to Jeff Savage, a vice-president of Erie, that Webb be named as his replacement. Savage demurred, saying that he could not afford to send a replacement to Oberlin for Webb two days every two weeks when Webb was on grand jury duty. The job was given to a manager who had quit the company one week before Altomare's resignation.

In January, 1984, Webb received a new work schedule cutting him from full-time work to 26 hours a week, and taking him off work every Wednesday and Thursday. His job assignment also changed to that of a truck driver. He asked Jeff Savage why his hours were being cut and was told that he was being put back to driving a truck because he wanted to give more in-store management experience to one Russ Larson. Webb asked Savage why he was not scheduled to work on Wednesday and Thursday, and Savage told him that, if the company had to give him four days a month off for jury duty, he (Webb) could give another four days to the company.

On March 22, 1984, Webb was sent to Bucyrus, Ohio to get a load of pipe. Returning that evening, he received a traffic ticket for "following too close," and when he returned home after the business was closed he left the truck outside and left a door open to the storage yard. He did not lock the gate. The next day he was called in to Jeff Savage's office and fired. He was told he was fired because of the traffic ticket and a company policy that a speeding ticket or a ticket for reckless driving was cause for termination, and because he had not properly parked the truck and had left the gate to the storage yard open.

At the hearing on the show cause, Webb testified that he had never been told of any dissatisfaction with his work by either Jeff Savage or his brother Justin Savage, another vice-president of Erie.

Russ Larson, presently employed by the defendants, testified that Webb was an honest employee, that he was honest in telling about the traffic ticket, and that, as far as he was concerned, Webb was a good employee. This testimony is particularly significant because Larson is still employed by Erie.

Tim Altomare, who was a disinterested witness because he no longer works for the defendants, said that Webb was a good employee and that he had done very well in his work at Erie Supply. Wyatt Simons, who presently is the branch coordinator for the Oberlin office of Erie Supply, said Webb was a good employee and praised his work. His testimony must be given added weight because he, like Larson, is presently employed by defendants.

Every witness testified, and Jeff and Justin Savage admitted, that Webb's grand jury duty had greatly upset the work schedule of Erie. Further, there was testimony and admissions on several occasions that both Justin and Jeff Savage made highly derogatory remarks about the grand jury, and Webb's service on it.

Both Justin and Jeff Savage testified that Webb had an extremely poor work attitude. They said his job performance declined, and that he was fired because of poor work performance, poor work attitude, lack of cooperation, and a decline in effectiveness. They claimed the final reason for his discharge was the traffic ticket he received, his failure to put the truck inside a fenced portion of the yard, and his leaving the gate open. They denied that the grand jury had anything to do with his discharge, but did admit the various derogatory remarks that they had made about the grand jury and Webb's service on it.

An exceedingly interesting exhibit was Exhibit No. 14, allegedly a personnel record of Ronnie Webb, with notations with reference to his attitude. The significant entry in this record is that of March 17, 1984, five days before Webb's firing, which states: "Generally extremely poor work attitude and lack of cooperation making for a real problem. Concerned about his continuing decline in job performance and effectiveness. Some action is required soon." This is only one of three entries in

the personnel record and was written shortly before he was fired.

In reading that record, the Court is reminded of the discussion of the United States Supreme Court in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), which excluded an accident report made by a since-deceased engineer offered by defendant railroad trustees in a grade crossing collision case. The report was excluded, although it was claimed it was properly part of the business records of the company. In excluding it, the Supreme Court said: "[Its] primary utility is in litigating, not in railroading." 318 U.S. at 114, 63 S.Ct. at 480. In addition, the Court of Appeals found that the engineer's statement was "dripping with motivations to misrepresent." *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir.1942).

Clearly this is what we have here. Despite the statements of Jeff and Justin Savage that they constantly warned Webb of his bad performance, the Court finds as a matter of fact that they did not, and that this document was prepared for the purpose of this litigation in an attempt to try to justify the discharge of Webb. The record is clear that the Savages were very upset about Webb's grand jury duties. They both acknowledged that they referred to the grand jury, and Webb's service on it, in a highly derogatory manner, and that Webb's attendance at it was highly disruptive. However, they continued to deny that this had anything to do with Webb's discharge.

The Court does not accept their protestations of innocence. They were unable to adequately explain the fact that they reduced Webb from 40 to 26 hours in January of 1984, and they were unable to explain why all who testified, except them, found him to be a good employee, conscientious and hard working. It is more than a coincidence that the Savages chose to reduce Webb's work hours and not have him work on Wednesdays and Thursdays when the grand jury met regularly on Wednesdays and Thursdays.

In light of the full record here, the Court concludes that Webb's hours were reduced, and he was finally discharged, because of his grand jury service.

## II

The Court deals here with a very precious and significant right and obligation of citizenship. Jury duty is the only time today when the government asks someone to give up his or her private pursuits to serve it. Although we have a military draft, no one is called today.

It is true that at times such service is highly inconvenient to employees and employers, but the maintenance and independence of the judiciary must be protected and can only be protected by protecting the rights of those who are called upon to serve as jurors. Jury service is a duty and right of citizenship, and our judicial system would be in jeopardy were not the integrity of the jury system, both grand and petit, protected. Both systems are basic to the protection of our constitutional freedoms. The jury, both grand and petit, is an essential arm of the judiciary, and without the judiciary our whole system of government would fall.

The importance of the grand jury to the administration of justice in the United States was recognized by the Supreme Court in *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In that case, the Court said:

> Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. . . . It cannot effectively operate in a vacuum. It has been said that the "ancestors of our 'grand jurors' are from the first neither exactly accusers, nor exactly witnesses; they are to give voice to common

repute." 2 Pollock & Maitland, *History of the English Law,* (2d Ed.1909), 642.

.  .  .  .  .

The administration of the law is not the problem of the judge or prosecuting attorney alone, but necessitates the active cooperation of an enlightened public. Nothing is to be gained by an attitude on the part of the citizenry of civic irresponsibility and apathy in voicing their sentiments on community problems.

*Id.* 370 U.S. at 390–91, 82 S.Ct. at 1373.

And in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Court said:

The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by "a presentment or indictment of a Grand Jury." (citation omitted)

*Id.* 414 U.S. at 342–43, 94 S.Ct. at 617.

Chief Justice Burger, in *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), reminded us that: "The grand jury is an integral part of our constitutional heritage which was brought to this country with the common law." *Id.* 425 U.S. at 571, 96 S.Ct. at 1773. And Justice Black, in *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), pointed out:

The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules.... Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases

shows the high place it held as an instrument of justice.

*Id.* 350 U.S. at 362, 76 S.Ct. at 408.

The legislative history of the Act shows that the Congress was most concerned in enacting this provision to protect the employment of jurors serving in the federal system.

This bill would also accord statutory protection to the employment status of Federal jurors during the period of jury service. At the present time, an employer who is hostile to the idea of jury duty, or who believes that the interest of his business outweigh the obligation for jury service imposed by law, may threaten or harass his employees to encourage their avoidance of such service or may even dismiss them from employment.... It is now difficult for the courts to respond effectively to such employer tactics, since instances of coercion or threatened dismissal are frequently not brought to the attention of the Court or are posed in such a manner as to evade effective response by the judge....

.  .  .  .  .

The proposed legislation would provide statutory employment protection to Federal jurors by adding a new Section 1875 to Title 28 and by giving the district courts jurisdiction over legal actions by aggrieved employee-jurors to redress their rights. The enactment of this provision would be desirable in redressing the present disparity of bargaining position between a harassing employer and his employee who is summoned for jury duty in Federal Court. It would also place employers on notice as to their legal duty not to interfer with jury service by employees and would offer employees the assurance that their rights in this regard will be protected by law.

H.R.Rep. No. 95–1652, 95th Cong., 2nd Sess., reprinted in 1978, U.S.Code Cong. & Ad.News 5477, 5480.

■ Therefore, it is clear that the provisions of 28 U.S.C. § 1875 must be strictly enforced, and no employer can be immune from its strict requirements. Otherwise

employees could be threatened, demoted, coerced and intimidated because of jury service, and were this to happen our entire jury system would be in jeopardy. Here the Court finds as a matter of fact that Webb was intimidated by his employer and was discharged by reason of his jury service in violation of 28 U.S.C. § 1875. There was no thought of discharge of Webb until he became a grand juror, and until that time he was doing very well in the company. The Savage brothers got upset with the grand jury and the disruption of their business, and they finally fired Webb on a pretext.

### III

The penalty provisions of 18 U.S.C. § 1875 are set forth in the margin.[3] In carrying out these provisions, the Court orders that Erie pay to Mr. Webb damages for lost wages in the amount of $780.00, and immediately reinstate him to the position he held prior to his discharge as if he had been on furlough or leave of absence during the period of discharge without loss of seniority. Additionally, the Court orders Erie to pay a civil penalty in the amount of $750.00. Finally, it is ordered that Erie be enjoined from taking any further action to discharge, threaten to discharge, intimidate

or coerce Webb by reason of his grand jury service.

Additionally, the Court notes that it did not appoint an attorney for Webb in accordance with 28 U.S.C. § 1875(d)(1)[4], but instead directed Mr. Lawless and Mr. Martin of the Department of Justice, who are in charge of presenting cases before the grand jury, to proceed on behalf of Mr. Webb. They did so, and prosecuted the case before this Court on his behalf.

While 28 U.S.C. 1875(d)(2)[5] provides for an award of attorney fees, this Court is of the opinion that the statute restricts the imposition of attorney fees to those cases where private counsel is appointed by the court upon a finding of probable merit. It is true that there was probable merit for proceeding here, but because of the willingness of the attorneys of the United States Justice Department to proceed with the handling of the matter, it was unnecessary for the Court to appoint counsel. Therefore, no attorney fees will be ordered.

---

3. (b) Any employer who violates the provisions of this section—
   (1) shall be liable for damages for any loss of wages or other benefits suffered by an employee by reason of such violation;
   (2) may be enjoined from further violations of this section and ordered to provide other appropriate relief, including but not limited to the reinstatement of any employee discharged by reason of his jury service; and
   (3) shall be subject to a civil penalty of not more than $1,000 for each violation as to each employee.
   (c) Any individual who is reinstated to a position of employment in accordance with the provisions of this section shall be considered as having been on furlough or leave of absence during his period of jury service, shall be reinstated to his position of employment without loss of seniority, and shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such individual entered upon jury service.

4. 28 U.S.C. § 1875 provides in pertinent part:
   (d)(1) An individual claiming that his employer has violated the provisions of this Section may make application to the district court for the district in which such employer maintains a place of business and the Court shall, upon finding probable merit in such claim, appoint counsel to represent such individual in any action in the district court necessary to the resolution of such claim. Such counsel shall be compensated and necessary expenses repaid to the extent provided by Section 3006(A) of Title 18, United States Code.

5. (d)(2) In any action or proceeding under this section, the court may award a prevailing employee who brings such action by retained counsel a reasonable attorney's fee as part of the costs. The Court may tax a defendant employer, as costs payable to the court, the attorney fees and expenses incurred on behalf of a prevailing employee, where such costs were expended by the court pursuant to paragraph (1) of this subsection.