**Beverly A. ROGERS, Plaintiff,**

v.

**COMPREHENSIVE REHABILITATION ASSOCIATES, INC., Defendant.**

**Civ. A. No. 2:92–3015–8.**

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 16, 1992.

E. Bart Daniel, Charleston, SC, for plaintiff.

Susan P. McWilliams, Columbia, SC, for defendant.

## ORDER

BLATT, District Judge.

This matter is before the court on the plaintiff's motion for a preliminary injunction pursuant to 28 U.S.C. § 1875. The parties appeared for a hearing on November 23, 1992, represented by their respective counsel. After a review of the briefs submitted, as well as the record and evidence herein, this court denies the plaintiff's motion for a preliminary injunction.

On October 21, 1992, this action was brought by the plaintiff, Beverly A. Rogers, against her former employer, the defendant, Comprehensive Rehabilitation Associates, Inc. In her complaint, the plaintiff alleged that the defendant, in violation of 28 U.S.C. § 1875, intimidated, coerced, and threatened her concerning her service on the federal grand jury. Plaintiff alleged that this intimidation and coercion occurred in the form of threats, reprisals, a change of duties and assignments, and, eventually, termination from her employ-

ment. With the filing of her complaint, the plaintiff filed a motion for a preliminary injunction, requesting that she be reinstated to her previous position of employment, as well as receive payment of all back wages, insurance, retirement and other benefits dating from the time of her alleged wrongful termination. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1875.

## I.

The defendant is a Massachusetts corporation, which does business in South Carolina, and maintains its only South Carolina office in Columbia. It is a provider of home health care services, and it receives referrals for case management from insurance companies, self-insured corporations, physicians and attorneys. From December 17, 1990, until April 6, 1992, the plaintiff was employed by the defendant as a Rehabilitation Specialist assigned to the defendant's Charleston territory, but under the jurisdiction of the defendant's office located in Columbia. On January 13, 1992, the Plaintiff received a summons from the United States District Court naming her as a grand juror for the Federal grand jury sitting in Charleston. During her employment, the plaintiff served on the grand jury a total of five days; court records indicated that, the grand jury met in Charleston on February 11, February 12, March 10, March 11 and March 12, 1992.

Upon a cursory review of this matter, the facts presented by the plaintiff may seem to indicate that the plaintiff was discharged because of her service on the grand jury; however, a closer examination of the facts suggests that the plaintiff's job performance declined during her jury service, and that this decline in performance was not due to her service on the grand jury. It appears to this court, based on the evidence presented at this time, that it was purely coincidental that the plaintiff was serving as a grand juror when her job performance deteriorated.

The plaintiff testified that prior to January, 1992, she did not have any major problems with her employer, and, in fact, she was one of the few employees who had reached what she described as, a "positive hour status"[1] that could lead to a bonus later in the year. She also stated that she had been given an oral evaluation 60 days after she began her employment and that she was rated very good in this evaluation. The plaintiff claims that her supervisor, at the time of her next evaluation, told her that she was being rated lower than her actual performance in order that her future evaluation would show an improvement so as to entitle her to a raise. The plaintiff's next evaluation, in December 1991, was an unscheduled evaluation, which resulted in plaintiff's being given a $3,000 salary raise to begin at the end of January, 1992. Plaintiff testified that she was told that she was given this raise because her employer did not want to lose her, and that she was instructed not to reveal the raise because it was against company policy for her to receive a raise at this time. The plaintiff argues that the granting of a raise in December, 1991, is an indication that her employer was pleased with her job performance until the time she received her grand jury summons in mid-January, 1992.

The defendant, on the other hand, presented testimony that the raise was given in part due to the plaintiff's job performance and in part to equalize the plaintiff's salary with certain new employees. The defendant also offered testimony that the company did not have a policy against giving raises such as that received by the plaintiff. In addition, the defendant's evidence indicated that the problems with plaintiff's job performance were not revealed until late January, 1992, when defendant began to receive complaints from clients concerning plaintiff's work.

The defendant's evidence included the affidavit of Jo Ann Heiting of Companion Property and Casualty Company, a former client of the defendant, which stated that,

---

**1.** The plaintiff was a salaried employee, but she was required to bill a set number of hours each week. Any hours the plaintiff billed above her required hours were considered "positive hours".

due to the plaintiff's deficient performance in handling a patient's case, that client terminated its relationship with the defendant on March 27, 1992. The defendant also submitted an affidavit from the patient involved, a Mr. Lyerly, who stated that he had not been contacted by the plaintiff for one month prior to being hospitalized, and that he was not contacted by the plaintiff while he was hospitalized.[2] The plaintiff's former supervisor, Hollie Hoadwonic, testified that Companion Property and Casualty Company not only refused to do further business with the defendant since March 27, 1992, but, in fact, because of the plaintiff's deficient performance, Companion Property and Casualty Company was considering the filing of litigation against the defendant.

The defendant also presented believable testimony indicating that the plaintiff falsified a billable hour report, that she was late in filing status updates and other reports, and that she did not follow company policy when she requested that an employer complete a job analysis form which, under defendant's rules, the plaintiff was required to complete. Ms. Hoadwonic testified that her decision to terminate the plaintiff was made on April 4, 1992, when plaintiff's co-employee, Ms. Lynn Lovette, reported to Ms. Hoadwonic that plaintiff caused Ms. Lovette great emotional distress by calling Ms. Lovette at home and blaming her for the plaintiff's work-related problems.[3] Ms. Hoadwonic indicated that her decision to terminate the plaintiff was based on the cumulative decline in plaintiff's job performance and working relationships, and that such termination was in no way related to plaintiff's grand jury service. The plaintiff admitted during her testimony that Ms. Hoadwonic made an extra effort to assure plaintiff that she would be paid in full during grand jury service.

Plaintiff admitted that her job performance may have been deficient, but she attributed this decline in her work performance solely to her service on the grand jury. Plaintiff claimed that she informed her employer that she could not maintain her work schedule because of the grand jury service; however, plaintiff admitted that she was able to maintain "positive hours" throughout her tenure as a grand juror. The plaintiff's testimony suggests that she was more focused on attaining "positive hour" status than with completing her normal job duties. It further appeared that defendant hired another employee, Ms. Lee Woodward, to alleviate the work burden on plaintiff during plaintiff's tenure on the grand jury. Since there was testimony that the defendant had planned to hire another individual before the plaintiff received her grand jury summons, it does not appear to this court that the defendant hired Ms. Woodward to assist the plaintiff solely because of grand jury duty. However, the court does feel that the defendant attempted to alleviate the plaintiff's burden by requesting that the plaintiff transfer some of her files to Ms. Woodward. In her affidavit, Ms. Woodward stated that the plaintiff was most uncooperative in transferring files to Ms. Woodward.

The defendant's evidence indicated that no one in the company ever requested that plaintiff ask to be excused from grand jury duty, and the plaintiff admitted that her employer never pressured her to be relieved from grand jury duty. The only issue that ever arose concerning plaintiff's grand jury service was the method in which the plaintiff would be paid. This issue prompted the plaintiff to request that the Clerk of Court's office, and later the U.S. Attorney's office, send written notification to her employer regarding her federally mandated duties with respect to grand jury service. The plaintiff argues that a lack of response from her employer to these letters evidences her employer's intent to disregard the importance of jury service. However, once the defendant was informed

---

**2.** The failure of the plaintiff to keep in close touch with Mr. Lyerly was totally contrary to company policy.

**3.** Ms. Lovette had been directed by defendant to contact one of plaintiff's patients who reported to defendant that he had been totally neglected by plaintiff.

of its legal obligations under 28 U.S.C. § 1875 and 29 C.F.R. § 541.118, the issue of compensation for the plaintiff was resolved to her satisfaction.[4] In fact, the plaintiff testified that she did not sustain any financial loss during her employment due to her service on the grand jury. This court does not place any significant import on the fact that the employer did not respond in writing to the letters from the government because it appears that the employer did respond to and obey the law called to its attention.

The plaintiff stated that her insurance benefits ended on April 6, 1992, the day of her termination, and that both her husband and son were covered under this policy. Plaintiff stated that she called the insurance company a short time after her termination to determine if previously approved surgery for her son would be paid, and she testified that the insurance company told her that since her policy had been canceled on April 6, 1992, the previously approved surgery for her son would not be paid. The plaintiff alleged that her husband had recently undergone open heart surgery and that she had suffered additional financial loss because her insurance had been canceled.

On cross-examination, the plaintiff was asked why she had not continued her benefits under COBRA (Consolidated Omnibus Budget Reconciliation Act of 1985), so that her son's previously approved surgery would be covered. Her testimony on this subject indicated to this court that she knowingly and voluntarily chose not to continue her insurance coverage.

In addition to the facts stated above, by letter dated July 31, 1992, from defendant's attorney, Leon Harmon, Esquire, defendant, while maintaining that it had legitimate, nondiscriminatory reasons for terminating the plaintiff, advised that it was willing to rehire the plaintiff in order to resolve this problem. This offer of re-employment required the plaintiff to perform the same type of work as in the past, but in the Savannah, Georgia, vicinity. This new work base would allow the plaintiff to be supervised from the Atlanta, Georgia, office instead of Columbia, since the plaintiff seemed to be at odds with the staff in the Columbia office. The plaintiff could have continued to live in Charleston and the company would have paid all of her travel expenses. The July 31, 1992, letter indicated that it was not unusual for the company's representatives to travel such distances in order to work the company's cases. The plaintiff's attorney, Bart Daniel, Esquire, by letter dated August 11, 1992, rejected the defendant's offer of re-employment but that letter did not state a basis for the rejection of the offer. However, the plaintiff testified that she rejected the offer of re-employment because she was not licensed to work in Georgia as a rehabilitation specialist, and that such a license was required before she could work there. The defendant's evidence indicated that the plaintiff could have readily obtained provisional certification until she was licensed, that the licensing procedure did not require an examination, and that defendant would have assisted plaintiff in obtaining the necessary licenses and certifications. Ultimately, the plaintiff filed this suit with the request for injunctive relief.

## II.

Initially, the court emphasizes that jury service is a duty and a right of citizenship which is a cornerstone of our entire system of government. The importance of jury service to the administration of justice cannot be underestimated and

---

4. While researching this issue, this court was surprised to find that there was a law requiring employers to pay salaried jurors for financial losses sustained as a result of jury service since neither 28 U.S.C. § 1871 nor 28 U.S.C. § 1875 refers to any such compensation. The court learned that 29 C.F.R. § 541.118 allows employers to deduct the compensation a juror receives from that juror's regular salary if that juror is a salaried employee, but under this regulation, the employee continues to receive his or her normal compensation. This court was dismayed to learn that there is no similar provision for hourly employees who risk sustaining financial losses if required to serve on a jury. This court feels an appropriate authority should investigate this situation and promulgate a regulation which provides both salaried and hourly employees with the same level of protection if required to serve on a jury.

must be zealously guarded by the judicial system. Jury service is often inconvenient to employees and employers alike, but the maintenance and independence of the judicial system must be protected by giving judicial protection to those who are called upon to serve as jurors. *In re Webb*, 586 F.Supp. 1480, 1483 (N.D.Ohio 1984). In order to facilitate the protection of jurors, employers must comply with 28 U.S.C. § 1875 which provides:

> No employer shall discharge, threaten to discharge, intimidate or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

This statute was designed to protect the juror from any employer who is "hostile to the idea of jury duty, or who believes that the interests of his business outweigh the obligation for jury service imposed by law." *Jeffreys v. My Friend's Place, Inc.*, 719 F.Supp. 639, 644–45 (M.D.Tenn.1989). 28 U.S.C. § 1875 has been interpreted to impose on the employer a duty to ensure that an employee is aware that the employee could report for jury duty without fear of reprisal and with full pay. *Jeffreys*, 719 F.Supp. at 645, citing *Jones v. Marriott Corp.*, 609 F.Supp. 577, 579 (D.D.C.1985). § 1875 also provides for damages against those who disregard its mandate, and it is one of the few employment statutes which provides for injunctive relief. With these principles in mind, the court must next decide whether the issuance of a preliminary injunction in this case is appropriate.

### III.

A preliminary injunction is "an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Murrow Furniture v. Thomasville Furniture*, 889 F.2d 524, 526 (4th Cir.1989) citing *Federal Leasing v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir.1981). This court has considered the evidence, exhibits, and information in accordance with the four-part standard enunciated in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg.*

*Co.*, 550 F.2d 189, 196 (4th Cir.1977) which is essentially a balance-of-hardships test. The probable irreparable harm to the plaintiff in absence of an injunction is weighed against the likely injury to the defendant if the injunction is granted. In judging where the balance falls, the court gauges the prospective merits of the plaintiff's case and considers the public interest in the controversy. In *Blackwelder*, the court stressed that the decision to grant or deny a preliminary injunction depends upon a flexible interplay among all the factors. There is a correlation between the likelihood of the plaintiff's success on the merits and the probability of irreparable injury to the plaintiff. If the likelihood of success is great, the need for showing the probability of irreparable harm is lessened. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. *Murrow Furniture*, 889 F.2d at 527 citing *North Carolina State Ports Auth. v. Dart Containerline Co. Ltd.*, 592 F.2d 749, 750 (4th Cir.1979).

The first step in the *Blackwelder* analysis is to balance the "likelihood" of irreparable harm to the plaintiff against the "likelihood" of harm to the defendant. Based on the record herein, this court finds that the plaintiff will not suffer irreparable injury in the absence of an injunction because her only apparent loss is an economic loss which normally, standing alone, cannot constitute irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 89–90, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1974). Plaintiff relies on *Jeffreys v. My Friend's Place, Inc.*, 719 F.Supp. 639, 644–45 (M.D.Tenn. 1989), which held that the plaintiff there had shown an irreparable injury because § 1875 created not only a private cause of action but also imposed a duty upon employers which runs not only to the employee, but, even more importantly, to the United States and its citizens in protecting the judicial process and the right to trial by jury. The *Jeffreys* court held that the economic loss sustained there by the plaintiff, in addition to the injury to the United

States and its citizens constituted irreparable harm. This court, as stated earlier, recognizes the great public interest in jury service and the potential harm to the United States and its citizens when the statute in question is violated. However, at least at this stage of the litigation, this court is not convinced that the statute has been violated, and, therefore, it does not appear that the public interest described has been implicated herein for the purposes of this motion.[5]

Additionally, this court finds that the "likelihood" of harm to the defendant is great. The harm to the defendant of having a disgruntled employee working on a daily basis with employees who may be testifying in the pending litigation against the plaintiff, especially in a small organization like the Columbia office of the defendant, is apparent, and it could be completely disruptive of the defendant's business. Furthermore, the testimony presented by the defendant that the plaintiff's deficient performance resulted in the loss of a client has not been adequately disputed by the plaintiff. Therefore, for the purposes of this motion, this court feels that the defendant's business will be disrupted, if the plaintiff is reinstated to her former position, and that such reinstatement could result in further losses of defendant's clientele.

The balance of hardships weighs in favor of the defendant; therefore, the plaintiff must show a greater likelihood of success on the merits. Based on the record herein, the court finds that the plaintiff has made a weak showing of a likelihood of success on the merits. The evidence before the court at this time indicates that during plaintiff's jury service revelations of conduct detrimental to her employer came to light. The majority of information concerning the plaintiff's conduct was brought to the employer's attention by third parties, and there is not any evidence, nor does the plaintiff contend, that her employer ever requested that she ask to be excused from jury service. In fact, at this time, there is nothing before the court that indicates that the defendant ever expressed any negative attitude toward the plaintiff's jury service. On the face of these proceedings, it may be possible to circumstantially tie in plaintiff's discharge with her grand jury service. However, the evidence presented by the defendant, for the purposes of this motion, significantly outweighs any circumstantial evidence of discrimination against the plaintiff due to jury service. The court finds that the defendant has presented strong evidence in the form of live testimony and affidavits which indicate that the plaintiff's job performance began to decline in January, 1992, for reasons independent of jury service. Moreover, the court finds that the timing of the plaintiff's raise alone does not indicate that she was discharged because of her jury service. Instead, this court feels that from the evidence before it at this time, it appears that the plaintiff's discharge had no connection to her service on the grand jury. As previously stated, this court finds from the evidence presented that the decline in plaintiff's performance coincidentally occurred during her jury service.

Although this court recognizes that 28 U.S.C. § 1875 places a heavy burden on a defendant who is accused of retaliation for, or interference with, jury service, this court is convinced that the statute was not passed to guarantee employment regardless of employee conduct during jury service. Plaintiff's jury service cannot place her in a position to avoid her work requirements that do not interfere with her jury service. Accordingly, for the above-mentioned reasons, the plaintiff's motion for a preliminary injunction is hereby denied.

IT IS SO ORDERED.

---

**5.** This court has reviewed *Jeffreys v. My Friend's Place, Inc.,* 719 F.Supp. 639 (M.D.Tenn.1989), and finds that the facts are as different as day and night from the facts of the instant case. While this court agrees that the atrocious conduct in *Jeffreys* entitled the plaintiff to a preliminary injunction, this court finds that the conduct here is "light years" away from the conduct of the employer in *Jeffreys,* who perjured herself and whose comments to the clerk of court and to the Chief Judge were abominable.