**In the Matter of William Lee SCHRAMM.**

No. 06–X–50410.

United States District Court, E.D. Michigan, Southern Division.

May 4, 2006.

---

**OPINION AND ORDER RELEASING WILLIAM SCHRAMM FROM GRAND JURY SERVICE**

FRIEDMAN, Chief Judge.

This matter is presently before the court on the court's review of a February 14, 2006, bench ruling concerning William Lee Schramm, who at that time was a sitting grand juror. For the reasons stated at the hearing in open court on the record, which are reiterated below, the court ordered that Mr. Schramm would no longer serve as a grand juror, but that on the days when the grand jury was in session he would sit in the main hallway of the courthouse.

**A.**

The facts of this case are a matter of record. On January 4, 2006, the court summoned a number of citizens, selected

at random from this district's qualified jury wheel, for purposes of selecting a 23–person grand jury and 13 alternates. After explaining the purpose of the grand jury and the time commitment involved in serving, the court administered an oath requiring the prospective jurors to "truthfully answer the questions put to you touching upon your qualifications to sit as a grand juror." All of the prospective jurors, including Mr. Schramm, took the oath.

Mr. Schramm was among the first 23 called. During the voir dire process, the court asked all of the prospective jurors various questions, including whether they had any philosophical or religious beliefs that would be incompatible with jury service; whether they had any medical problems that would interfere with jury service; whether they objected in principle to certain law enforcement techniques such as court-authorized electronic surveillance; and whether they had any personal feelings against the government prosecuting offenses such as drug trafficking, firearms violations, or tax cases. In addition, the court asked the prospective jurors whether there was **"anything we have not covered that you believe you should disclose by way of background or your ability to sit and be a fair and impartial person to sit and listen to the evidence.... Does anyone feel they have something in their background that wouldn't allow them to do that?"** None of the prospective jurors, including Mr. Schramm, responded to any of these questions.

The court then held a sidebar conference with the jury clerk and the Assistant United States Attorney to determine which of the prospective jurors should be excused, primarily for medical or financial hardship, based on answers given during the voir dire or in letters submitted with the jury summonses. The court excused a number of prospective jurors for various reasons. However, the court had no occasion to consider excusing Mr. Schramm because he said nothing during voir dire to suggest the existence of any type of hardship or bias, nor had he submitted a request with the jury clerk seeking to be excused or deferred.[1] Mr. Schramm therefore remained within the first 23 seats and became a *sitting member* of the grand jury upon administration of the following oath:

> You, as members of this grand jury inquest, do solemnly swear to diligently inquire, and true presentment make, of all such matters and things as shall be given to you in charge, or otherwise come to your knowledge, touching the present service. The counsel of the United States, your fellow jurors and your own, you shall keep secret, unless called upon in a court of justice to make disclosure. You shall present no person through malice, hatred or ill will, nor shall you leave any person unpresented through fear, favor or affection, or for any reward or hope thereof, but, in all your presentments you shall present the truth, the whole truth, and nothing but the truth, according to the best of your skill and understanding, so help you God.

Mr. Schramm, along with the other grand jurors, stood, raised his right hand,

---

1. On his juror qualification questionnaire, Mr. Schramm answered "no" to the question asking whether he had "any physical or mental disability that would interfere with or prevent you from serving as a juror?" The "remarks" section on this questionnaire provides an opportunity for prospective jurors to "complete any answers to the questionnaire which require more information or more space," and specifically requests information regarding any "undue hardship or extreme inconvenience" that might constitute grounds for being excused. Mr. Schramm wrote nothing in the remarks section of his questionnaire.

and swore the oath. The court then gave the grand jury extensive, additional instructions regarding their responsibilities, the important role of the grand jury within the criminal justice system, and the duty of each grand juror not to participate in any investigation if he "is biased for any reason." Once again, Mr. Schramm raised no objection to serving.

Mr. Schramm listened to testimony as a sitting grand juror for three days. He then wrote a letter to the court requesting to be excused. Mr. Schramm indicated, among other things, that he should not be required to serve because "I do not respect law enforcement agents to [sic] much"; "I don't really respect the way trials are conducted"; "I honestly didn't care one bit what was taking place in the [grand jury] room"; "I just don't care enough about other people"; "I am somewhat biased toward minority groups"; "I am self employed and will have to most likely file bankruptcy if I have to do this for 6 months"; and "I know you have to put the fairest people in that room, and I am not one of them." Mr. Schramm also stated: "Truth is that if you look at the percentages, minority groups are more violent and responsible for felony crimes more so than non-minorities. I know if there is a case charging an African American person, they are probably guilty, where a Caucasian more likely isn't."

The court was concerned about Mr. Schramm's letter because he was sworn to reveal these sentiments during the voir dire process and/or in response to questions on the juror qualification questionnaire. Further, the court's jury clerk personally advises all prospective jurors, before they are brought to the courtroom, to inform the court of any possible vacations, health problems, or other issues which may interfere with jury service. Mr. Schramm said nothing to the jury clerk, wrote nothing on his juror qualification questionnaire (which he signed under penalty of perjury), and said nothing during voir dire (after he swore to answer all questions truthfully) that would indicate the existence of any such problem. The statements in Mr. Schramm's letter were directly contrary to his silence during voir dire, when the court—after administering an oath requiring truthful answers—*inquired specifically about bias or prejudice* or anything else that might interfere with jury service.

In response to this letter, the court directed Mr. Schramm to appear in the courtroom, which was public and open, on February 14, 2006. Mr. Schramm appeared and the matter was called in open court with a public record being made by an official court reporter and members of the public present. The court asked Mr. Schramm if he recalled during the voir dire "me asking almost every question that you articulated in this letter you sent to me." Mr. Schramm denied recalling that the court had made any such inquiry. The court concluded that Mr. Schramm was being untruthful and excused him from grand jury service. However, the court also directed Mr. Schramm to report to the courthouse every day that the grand jury reported, but that he would no longer be a member of the grand jury.

Mr. Schramm then indicated, for the first time, that he was "having a lot of anxiety over this and having to take medications that are addictive," that "[e]very day that I miss work sets me back about three weeks," and "I got an ulcer developed." The court requested medical documentation, and Mr. Schramm indicated he would "get it today" and submit it to the jury clerk.

Mr. Schramm submitted just one piece of medical documentation, namely, a February 15, 2006, letter from a medical doc-

tor associated with Digestive Disease Consultants, P.C., who indicated that he had "chronic acid reflux, which is not responding to medical therapy." The doctor also indicated that Mr. Schramm would need "further medical investigation of his symptoms and this will require several days of testing." The doctor's note did not suggest that Mr. Schramm should be excused from jury duty. Mr. Schramm submitted nothing to support his claimed problem regarding anxiety, his claimed need to take addictive anti-anxiety medication, or his claimed problem with an ulcer.

The court heard nothing further from Mr. Schramm until March 22, 2006, when he submitted a note to the court requesting permission to visit his grandfather in Florida. The court granted the request—in fact, the court allowed Mr. Schramm to go for a longer period than requested.

### B.

As every chief judge of this court has indicated in his/her charge to grand juries,

> The framers of our Constitution deemed the grand jury so important for the administration of justice that they included it in the Bill of Rights. The Fifth Amendment to the United States Constitution provides, in part, that no person shall be held to answer for a capital or otherwise infamous crime without action by a grand jury.
>
> ... As members of the grand jury, you, in a very real sense, stand between the government and the accused.

In our country's criminal justice system, the grand jury holds an enormously important and historically revered position. The grand jury is an "English institution" that was "brought to this country by the early colonists." *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Throughout our history, "this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). Thus, the grand jury "operates both as a 'sword,' authorizing the government's prosecution of suspected criminals, and also as a 'shield,' protecting citizens from unwarranted or inappropriate prosecutions." Admin. Office of the U.S. Courts, *Handbook for Federal Grand Jurors*, at 3.

As noted above, a grand jury consists of ordinary citizens who are selected at random and are intended to represent a fair cross-section of the community. Grand jurors are a critical check and balance on the power of the executive branch of government because no person may be prosecuted on indictment without their approval. Obviously, those selected as grand jurors must have a high level of integrity and make a commitment to serve with unimpeachable honesty and fairness. The purpose of requiring prospective jurors to complete the juror qualification questionnaire, and of subjecting them to the voir dire process, is to ferret out those who, for whatever reason, are unfit or unable to serve *prior to being selected*. Obviously this purpose is thwarted when a juror such as Mr. Schramm fails to answer these questions honestly and then, *after being selected and commencing service*, reveals his racist prejudices and his complete lack of interest in participating in this important work.

### C.

The court's purpose in requiring Mr. Schramm to report to the courthouse, and to sit in the hallway near the front entrance, was three-fold. First, the court felt it was important to impress upon Mr. Schramm the importance of serving jury duty and responding truthfully to the court's questions in connection therewith—

particularly during the voir dire, where prospective jurors take an oath to do so. While the court could have initiated contempt proceedings against Mr. Schramm, or even punished him summarily by fining or imprisoning him, *see* 18 U.S.C. § 401, or referred the matter to the United States Attorney for criminal prosecution, the court elected to pursue less drastic sanctions so as not to burden Mr. Schramm with a criminal record that would remain with him for life.

Second, the court hoped that punishing Mr. Schramm for violating his civic duty, and for lying to the court, would deter others from engaging in similar misbehavior. Jury duty is a civic responsibility that must be shared equally by all citizens who are called. The jury system, which is a critically important component of our system of justice, simply cannot function if, as did Mr. Schramm, jurors treat jury service lightly, fail to honestly answer questions regarding their qualifications when called upon and then, after having been selected, present the court with a pack of lies in order to avoid service.

Third, the court believed it was important for the other grand jurors to see that Mr. Schramm's improper effort to avoid jury duty had failed. It would certainly be unfair to the other grand jurors if they were required to serve while one of their members could avoid doing so simply by writing a letter to the judge, after the selection process had been completed, saying, in effect, "Hey, I just remembered. I'm biased, a racist, have health problems, and will go bankrupt if you don't let me go." By requiring Mr. Schramm to sit near the courthouse entrance on the days when the grand jury was in session, the court ensured that the other grand jurors were aware that Mr. Schramm's effort failed. The court has been informed by its jury staff that Mr. Schramm's presence in the courthouse hallway had a most beneficial effect on the grand jurors' morale.

Unfortunately, the deterrent effect of the court's action was seriously undercut by a series of three articles that appeared in a local newspaper regarding the Schramm incident. The articles omitted a number of important aspects of the case and misstated others.

The first article, Paul Egan, *Irk Judge, Get Time–Out Chair*, The Detroit News, April 10, 2006, at 1A, reported that Mr. Schramm "balked at sitting on a grand jury," but neglected to mention that he did not "balk" until after he was selected, after he took the oath of service, and after he served three sessions as a sitting grand juror. The article also neglected to mention that Mr. Schramm "balked" by writing a letter in which he claimed to have anti-government and anti-minority biases, as well as financial reasons for being excused, none of which Mr. Schramm had previously disclosed, either on the juror qualification questionnaire or during the voir dire process, despite having been questioned directly on these issues. The article also neglected to mention that both the January 4, 2006, voir dire and the February 14, 2006, hearing were conducted in the courtroom and on the record. Nor did the newspaper reporter order a transcript of the latter proceeding (falsely characterized as a "meeting"), although he easily could have done so through the court reporter, as Mr. Schramm himself did. If the newspaper reporter had bothered to order a copy of the transcript, he would also have discovered that, contrary to the statement in his article that Mr. Schramm "wouldn't be allowed to read," the court in fact indicated that he had "a lot of reading to do." The newspaper reporter also would have discovered that the court did not characterize Mr. Schramm's letter as "bs," as was reported. Again,

contrary to the representations of the newspaper reporter, this court would have been most specific as to all issues involved in this case if asked and given an opportunity, as has been its consistent practice over the past 24 years with every member of the news media, including reporters for The Detroit News.

The second article, which appeared on the editorial page, *Judge Out of Bounds,* The Detroit News, April 13, 2006, at 12A, falsely indicated that the court's decision regarding Mr. Schramm was reached without a hearing or a record. This error was repeated in the third article, Paul Egan, *'Juror' Resumes Bench–Sitting,* The Detroit News, April 19, 2006, at 2B, which referred to the court's "verbal order" but neglected to mention that the order was made at the conclusion of a hearing in open court on the record. Additionally, this article falsely stated that the court "has not returned calls seeking comment." Although the reporter called the court's chambers twice (on April 12 and April 18), he merely identified himself to staff by name and did not indicate that the purpose of his call was to seek comment on this matter or anything else.

The court encourages newspapers and other media to exercise their First Amendment right to report on any newsworthy events, including the activities of this court. However, the court is dismayed at the lack of responsible coverage in this instance, where the newspaper reporter omitted some facts, misrepresented others, and neglected to conduct basic research—and committed the same errors repeatedly. Moreover, the articles committed a great disservice by failing to convey all of the facts of the case, or any of the court's purposes in dealing with Mr. Schramm as it did, and by suggesting instead that an injustice was done *to Mr. Schramm* because the court was "irked" when he "balked at sitting on a grand jury" and made a verbal order at an off-the-record "meeting" placing him in the "time-out chair." Perhaps this newspaper reporter should reflect on his own responsibility to the public to report all of the facts in a fair, complete and balanced fashion *after a good faith investigation.* While some media may trivialize grand jury service and the harm done by a juror intent on "playing games" with this constitutional body, it is difficult to imagine they would do so if fully informed of the facts of this case and the history and purpose of the grand jury. And while the media may report incidents as they please, the public has the right to expect them to do so fairly and responsibly and to capture the essence of the total picture.

As a well respected Detroit News reporter once commented,

> [Y]ou have to be fair, you have to be honest. . . . And a beat reporter that does not do that very soon is not getting any stories out of his beat and his boss is going to know why.

Testimony of Don Ball, *Public Hearings, Proposed Set of Guidelines for Conduct, U.S. District Court, Eastern District of Michigan,* May 2, 1985, at 46. Further, we should all remember the words of James Vesely, a former managing editor of The Detroit News, speaking on behalf of himself and his newspaper at the same public hearings:

> Each of us has high stakes in the public confidence in the working of our justice system. Your role, of course, is to fairly and evenly administer justice. The press's role is to fairly report the workings of the justice system. Both of us have a duty to criticize each other if our performance is not what it should be.

*Id.,* May 9, 1985, at 61–62.

## D.

Having discussed this matter with Mr. Schramm's attorney, the court believes

that no purpose would be served by requiring Mr. Schramm to continue reporting to the courthouse. Presumably Mr. Schramm now understands the importance of jury service, and of responding truthfully to the court's questions touching upon his qualifications to perform such service. Accordingly,

IT IS ORDERED that William Lee Schramm is discharged.